**VIRGIN ISLANDS TAXI ASSOCIATION, Appellant/Plaintiff**

**v.**

**VIRGIN ISLANDS PORT AUTHORITY, FREDDY LETTSOME, EAST
END TAXI SERVICES, INC., THE RITZ-CARLTON VIRGIN ISLANDS,
INC., AND CANEEL BAY RESORT, Appellees/Defendants**

S. Ct. Civil No. 2016-0035

Supreme Court of the Virgin Islands

July 26, 2017

644

645

647

649

650

LEE J. ROHN, ESQ., RHEA LAWRENCE, ESQ., Law Officers of Lee J. Rohn and Associates, LLC, St. Croix, USVI, *Attorneys for Appellant.*

GREGORY H. HODGES, ESQ., STEFAN B. HERPEL, ESQ., Dudley, Topper and Feuerzeig, LLP, St. Thomas, USVI, *Attorneys for Appellee The Ritz-Carlton Virgin Islands, Inc.*

MARK D. HODGE, ESQ., Law Offices of Hodge & Hodge, St. Thomas, USVI, *Attorney for Appellees Freddy Lettsome and East End Taxi Services, Inc.*

W. MARK WILCZYNSKI, ESQ., Law Offices of W. Mark Wilczynski, PC, St. Thomas, USVI, *Attorney for Plantation Bay, Inc. f/k/a Caneel Bay Resort.*

NYCOLE A. THOMPSON, ESQ., Virgin Islands Port Authority, St. Thomas, USVI, *Attorney for Appellee the Virgin Islands Port Authority.*

CABRET, *Associate Justice*, MOLLOY, *Designated Justice*,[1] and BRADY, *Designated Justice*.[2]

## OPINION OF THE COURT

### (July 26, 2017)

CABRET, *Associate Justice*. The Virgin Islands Taxi Association ("VITA") appeals the Superior Court's June 10, 2016 memorandum opinion and order dismissing its complaint with prejudice. Although VITA's request for injunctive relief is moot and its request for contempt sanctions was appropriately reversed by the Appellate Division of the District Court of the Virgin Islands, the Superior Court erred in dismissing VITA's complaint for failure to prosecute and VITA is still entitled to pursue its claim for damages. For the reasons set forth below, we affirm the June 10, 2016 memorandum opinion and order in part, reverse in part, and remand this matter for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The matter before the Court concerns the interplay between an exclusive franchise granted to VITA by the Legislature pursuant to Act 5231, and the consequences flowing from alleged interference with that franchise.

---

[1] Chief Justice Rhys S. Hodge is recused from this appeal. The Honorable Robert A. Molloy, a Judge of the Superior Court of the Virgin Islands, sits in his place by designation pursuant to title 4, section 24(a) of the Virgin Islands Code.

[2] Associate Justice Ive Arlington Swan is recused from this appeal. The Honorable Douglas A. Brady, a Judge of the Superior Court of the Virgin Islands, sits in his place by designation pursuant to title 4, section 24(a) of the Virgin Islands Code.

On December 29, 1986, the Legislature approved Act 5231. Act 5231 grants VITA "the exclusive right and franchise to operate all public taxicab services from Cyril E. King Airport on the Island of St. Thomas." Act 5231 § 1(a), 1986 V.I. Sess. Laws 390, 390-91. Section 1(e) of Act 5231 contains exceptions to this exclusive franchise, including an exception for "persons . . . departing . . . by a motor vehicle owned, operated, or utilized by a tour agent in the transportation of passengers traveling on a prepaid or prepackaged tour . . . provided that transportation from the [St. Thomas airport] is part of the overall transportation arranged for in the prepaid or prepackaged tour." Act 5231 § 1(e), 1986 V.I. Sess. Laws 390, 391. Under Act 5231, VITA's exclusive franchise begins on the first day of the month following VITA's acceptance of the franchise, and continues for a period of ten years, while granting VITA an option to renew the franchise for an additional ten-year period. Act 5231 § 1(f), 1986 V.I. Sess. Laws 390, 391. Act 5231 obligates VITA to file an acceptance of the franchise with the Virgin Islands Taxi Commission "within 60 days of the enactment of [Act 5231]." Act 5231 § 1(aa), 1986 V.I. Sess. Laws 390, 396. Act 5231 also obligates the Virgin Islands Port Authority ("VIPA") to provide VITA with office space at the airport, along with space for its taxis. Act 5231 § 1(g), 1986 V.I. Sess. Laws 390, 392. In the event that VITA remains in possession of this space after the expiration of the franchise, section 1(m) of Act 5231 states that VITA "shall be deemed to be occupying the premises as a tenant month to month, subject to all applicable conditions, provisions and obligations of [the] franchise." Act 5231 § 1(m), 1986 V.I. Sess. Laws 390, 393.

On February 11, 1997, VITA filed a five-count complaint in the Superior Court of the Virgin Islands against VIPA, Freddy Lettsome ("Lettsome"), East End Taxi Services, Inc., ("East End Taxi"), Ritz Carlton Virgin Islands, Inc., ("Ritz Carlton"), and Caneel Bay Resort ("Caneel Bay") (collectively "Appellees").[3] VITA alleged that, pursuant to Act 5231, VITA held an exclusive franchise to operate all public taxicab services from the St. Thomas airport, the terms of which allegedly

_____

[3] All references to "Caneel Bay" noted by this abbreviation refer to Caneel Bay, Inc., — later renamed Plantation Bay, Inc. — which entity held the assets commonly referred to as the Caneel Bay Resort on St. John. This abbreviation does not refer at all to CBI Acquisitions, LLC, which acquired the assets known as Caneel Bay Resort in May of 2004, as discussed below.

obligated VIPA to ensure that other taxi operators did not infringe upon VITA's exclusive franchise. Under count 1 of its complaint, VITA sought to enjoin VIPA, Lettsome, East End Taxi, Caneel Bay, and the Ritz Carlton from further violations of VITA's exclusive franchise under Act 5231. VITA premised its request on allegations that VIPA had failed to protect VITA's exclusive franchise, resulting in "immediate, irreparable and continuing harm" to VITA for which VITA has "no adequate remedy" at law. VITA does not purport to request relief in count 2 of its complaint. Instead, count 2 of VITA's complaint contains allegations that Lettsome, a driver for East End Taxi, regularly solicits customers from the St. Thomas airport in violation of VITA's exclusive franchise. Count 3 of VITA's complaint contains similar allegations with respect to East End Taxi, and alleges that, if not enjoined, East End Taxi's solicitation of customers at the St. Thomas airport subjects VITA to severe injury. In count 4 of its complaint, VITA alleges that Caneel Bay and the Ritz Carlton contract with independent taxi drivers to pick up and transport guests to their respective hotels. VITA does not request specific relief against the Ritz Carlton or Caneel Bay in count 4, but alleges that VIPA's continued failure to prevent the Ritz Carlton or Caneel Bay from engaging in such practices jeopardizes VITA's exclusive franchise. Finally, count 5 of VITA's complaint contains an allegation that the conduct of all Appellees "has resulted in loss of earnings and fares reviews [sic] to [VITA] and its members," and a request for damages "for all revenues and fares lost to unauthorized and illegal operators who openly violate the terms of [VITA]'s exclusive franchise."

On the same day that VITA filed its complaint, it also moved for a temporary restraining order, preliminary, and permanent injunction to restrain the defendants from picking up passengers at the St. Thomas airport in violation of VITA's exclusive franchise. In its attached memorandum of law, VITA substantiated its request for injunctive relief in part by arguing the defendants' violations of VITA's exclusive franchise caused irreparable injury to VITA. VITA substantiated that claim in part by arguing that it

> and its members loose [sic] taxi fares and incur expenses by paying the franchise fee of $2500 per month. Each driver pays a daily fee charged [sic] to be applied to the concession fee. [VITA]'s members incur expenses for gas as they maintain their vehicles in line and must remain at the airport.

VITA did not premise its motion for a TRO on the proposition that damages for violation of the exclusive franchise were incalculable.

On February 13, 1997, the Superior Court granted VITA's request in part, and entered a TRO prohibiting VIPA from permitting and facilitating violations of VITA's exclusive franchise under Act 5231, and prohibiting the remaining Appellees from operating taxi services from the St. Thomas airport, except as permitted under section 1(e) of Act 5231. In support of this result, the Superior Court reasoned in part that VITA would suffer irreparable harm in the absence of a TRO because, "[w]hile [VITA] has alleged that it may be entitled to damages, the Court questions whether [VITA] could establish to any degree of certainty the revenue lost by it and its approximately four hundred (400) members due to direct competition of innumerable others . . . ."

As scheduled by the TRO, VITA's request for preliminary injunctive relief came before the Superior Court for a hearing on February 26, 1997. Following the hearing, the Superior Court granted VITA's request for a preliminary injunction by order entered on March 10, 1997. The Superior Court reasoned that a party seeking injunctive relief demonstrates irreparable harm if that party demonstrates "the impossibility of ascertaining with any accuracy the extent of [its] loss." *V.I. Taxi Ass'n, Inc. v. V.I. Port Auth.*, 36 V.I. 43, 50 (V.I. Super. Ct. 1997). It observed that the Appellees' solicitation of passengers from the airport in violation of VITA's exclusive franchise caused "an erosion of this franchise resulting in incalculable losses to [VITA]," *id.* at 46, and further observed that VITA's members "daily suffer incalculable economic loss" from the Appellees' actions. *Id.* at 49. The Superior Court also recognized that, as written, Act 5231 did not violate the Dormant Commerce Clause by placing an undue burden on interstate commerce. Ultimately, the Superior Court concluded its memorandum opinion by observing that VITA carried its burden, and was entitled to "a preliminary injunction prohibiting the defendants . . . from violating the exclusive franchise granted by the Act [5231] to [VITA]." *Id.* at 57-58.

In its order granting VITA's motion for a preliminary injunction, the Superior Court enjoined VIPA "from permitting and facilitating others than [VITA] and those identified in Section 1, subsection (e) of Act No. 5231 from operating public taxicab service" from the St. Thomas airport. The Superior Court similarly enjoined Lettsome, East End Taxi, the Ritz Carlton, Caneel Bay, "and all others similarly situated" from

"operating public taxicab services" from the St. Thomas airport "except as provided in Act No. 5231, Section 1, subsection (e)[.]"

Because the references to section 1(e) of Act 5231 created confusion amongst the Appellees with respect to what behavior the Superior Court had enjoined and the Appellees complained that the Superior Court's order was nothing more than an "obey the law" injunction, VITA moved to amend the Superior Court's March 10, 1997 preliminary injunction order. The Superior Court granted VITA's motion by order entered on May 27, 1997, and instead of referencing section 1(e) of Act 5231, the Superior Court inserted the language of that section following a clause indicating that VITA "has the exclusive right" to transport all persons from the St. Thomas airport.[4]

In the first of two appeals to the District Court of the Virgin Islands, Appellate Division in this matter, the Appellees challenged the Superior Court's decision to award a preliminary injunction to VITA. *See V.I. Port Auth. v. V.I. Taxi Ass'n*, 979 F. Supp. 344, 345 (D.V.I. App. Div. 1997). The Appellate Division affirmed the Superior Court's entry of a preliminary injunction by order entered September 22, 1997. In its memorandum opinion accompanying its order, the Appellate Division affirmed that Act 5231 does not violate the Dormant Commerce Clause to

---

[4] With respect to the injunction against VIPA, the amended order reads in full:

> ORDERED that the defendant Virgin Islands Port Authority and its officers, agents, servants, employees, attorneys, assignees, successors in interest and all persons acting in concert or participating with them, are restrained, enjoined and prohibited from permitting and/or facilitating others than [VITA] in operating public taxicab service from the Cyril E. King Airport, St. Thomas, as [VITA] has the exclusive right to transport all persons from the terminal area *except those departing by foot, privately owned motor vehicle where no fee is charged, by motor vehicle furnished by a concessionaire of a motor vehicle rental (drive yourself) business at the terminal facility or by a motor vehicle owned, operated or utilized by a tour agent in the transportation of passengers traveling on a prepaid or prepackaged tour, which has a minimum price of $50[ ] and includes either lodging or transportation on an ocean common carrier; provided that transportation from the terminal facility is part of the overall transportation arranged for in the prepaid or prepackaged tour.*

(Emphasis added). The Superior Court modified its injunction with respect to the remaining defendants by using the exact same language. But while the Superior Court's amended preliminary injunction removed any reference to Act 5231, the italicized language in the preceding excerpt matches the exceptions to VITA's franchise listed in section 1(e) of Act 5231 in precise detail. Consequently, the Superior Court's May 27, 1997 modification of its March 10, 1997 preliminary injunction in no way enlarged the scope of that injunction.

656

the extent that it applies to guests that "had not prepaid or prearranged" for service from the airport. 979 F. Supp. at 347-52. The Appellate Division further noted that the improbability of calculating monetary damages sustained a finding of irreparable injury. *Id.* at 352.

Effective May 10, 2004, Caneel Bay sold the assets of the property commonly known as "Caneel Bay Resort" on St. Thomas to CBI Acquisitions, LLC, changed its name to Plantation Bay, Inc., and ceased its business operations in the U.S. Virgin Islands. Under the terms of the asset purchase agreement, CBI Acquisitions assumed no liability for any aspect of its predecessor's operations. CBI Acquisitions was not joined as a party to this lawsuit.

VITA took no action in this matter from the time that the Appellate Division affirmed the preliminary injunction on September 22, 1997, until May 12, 2004. On that date, VITA filed a motion against VIPA, requesting an order directing VIPA to show cause why it should not be held in contempt of court for its failure to enforce VITA's franchise under the terms of the preliminary injunction. Following a hearing on June 24, 2005, the Superior Court entered an August 3, 2005 order concluding that VIPA "has been in flagrant and willful violation" of the preliminary injunction, and finding VIPA in contempt of court for that violation. The Superior Court continued by stating that VIPA was prohibited from permitting any taxi driver who is not a member of VITA from picking up passengers for hire at the airport "unless the taxi operator and passenger can present a valid pre-paid voucher or receipt." The order did not mention "prearranged" vouchers, despite the fact that section 1(e) of Act 5231 exempted transportation that was part of a "prepaid or prepackaged tour." 1986 V.I. Sess. Laws 390, 391. The Superior Court further ordered all remaining Appellees to "cease and desist from operating in a manner contrary to the statutory requirements of Act 5231" and the previous opinions and orders of the Superior Court and Appellate Division. The Superior Court also ordered VITA to submit an estimate of costs and damages arising from VIPA's alleged noncompliance with the preliminary injunction.

On September 2, 2005, VITA submitted its estimate of costs and damages incurred due to VIPA's alleged failure to enforce VITA's exclusive franchise. In this document, VITA estimated that, from 2003 through 2004, it lost approximately $11,000 per month to an entity identified as Kelly Tours — a nonparty to the suit — during the high tourist season, which runs from November through April, due to Kelly Tours' use of transportation vouchers that did not comply with the exceptions to Act

657

5231 and the preliminary injunction. VITA further estimated that, for that same period of time, it lost approximately $6,800 per month to Kelly Tours during the months of May through October owing to the use of those same vouchers. VITA substantiated these numbers with summaries of transportation vouchers used by Kelly Tours. Despite the Superior Court's August 3, 2005 order finding VIPA in contempt and VITA's September 2, 2005 attempt to substantiate damages due to VIPA's behavior, the Superior Court did not levy sanctions against VIPA.

On February 8, 2006, VITA filed a second motion to enforce the preliminary injunction, this time seeking a show cause order to be directed not only to VIPA, but Lettsome, East End Taxi, the Ritz Carlton, and Caneel Bay.[5,6] In this motion, VITA sought remedial (compensatory) and coercive contempt sanctions from the Appellees and other nonparties.[7] VITA argued, among other things, that although the Appellees' alleged noncompliance with the preliminary injunction made it "difficult, if nigh impossible, for VITA to calculate its compensatory damages," it should still be allowed to substantiate its losses with as much accuracy as it is able.

On March 1, 2006, the Superior Court held a hearing on VITA's February 8, 2006 motion. By memorandum opinion and order entered on June 13, 2006, the Superior Court found VIPA, East End Taxi, the Ritz Carlton, and Caneel Bay in contempt of court. As a result, the Superior Court assessed each defendant with a "coercive civil sanction[ ] to ensure future compliance" of $1,000 per day, effective from March 1, 2006 until each defendant complied with the preliminary injunction.[8,9]

---

[5] In its February 8, 2006 motion, VITA also requested that a summons and a show cause order be served on nonparties Starwood Hotels & Resorts Worldwide d/b/a The Westin Resort, Caribbean Travel Agency, Inc. d/b/a Tropic Tours, Kelly Tours, Judy Wheatley, Caribbean Tours Services, Inc., Dynamic Tours, Inc., Windridge, Inc., Gonzi's Limousine Service, Honey B Limousine Service, First Class Tours, and Island Meetings and Incentives, Inc.

[6] VITA also sought another TRO against the Appellees, but that portion of its motion was denied by order entered on February 15, 2006.

[7] For a list of the nonparties implicated in VITA's February 8, 2006 motion, *see* note 5, above.

[8] By imposing sanctions effective as of March 1, 2006, the sanctions imposed by the Superior Court's June 13, 2006 order necessarily included both a fixed, retroactive component — for the period of time that had already expired — as well as a prospective, forward-looking component.

[9] The Superior Court did not levy sanctions against the nonparties identified in VITA's February 8, 2006 motion.

VIPA, East End Taxi, Caneel Bay, and Ritz Carlton prosecuted the second appeal of this matter to the Appellate Division, when they appealed the Superior Court's June 13, 2006 contempt and sanctions order. Prior to the resolution of this appeal, the second 10-year period under Act 5231 expired in 2007. The Appellate Division resolved the appeal by memorandum opinion and order entered February 6, 2008. First addressing its jurisdiction, the Appellate Division determined that, despite the Superior Court labeling its sanctions as "coercive civil sanctions," the retroactive component of the Superior Court's sanctions order constituted "a criminal contempt sanction" because it "was fixed, unconditional, lacked a sufficient evidentiary basis, and was not made payable to VITA." The Appellate Division further characterized the continuing $1,000 per day fine as coercive because it was designed to "coerce future compliance with the . . . preliminary injunction and the August 3, 2005 order." Because the Superior Court's sanctions contained both punitive and coercive elements, the Appellate Division treated the entire June 13, 2006 sanctions order as a criminal contempt order, over which it could exercise jurisdiction.

The Appellate Division then turned to the merits of the Appellees' challenge. The Appellees first argued that VITA's franchise expired on April 30, 1997, that VITA never properly renewed the franchise, and that as such, none of the defendants could be held in contempt for violating the Superior Court's subsequent preliminary injunction and August 3, 2005 contempt order. The Appellate Division observed that "[w]hether VITA renewed the franchise . . . depends on whether a valid contract for the renewal of such franchise existed." It rejected VITA's argument that section 1(m) of Act 5231 applied to the extension of the franchise agreement, but expressed concern that "the evidence in the record is insufficient" to support the conclusion that VITA validly renewed its franchise. Nevertheless, the Appellate Division directed the Superior Court to address the issue on remand.

Assuming that VITA validly renewed the franchise, the Appellate Division next considered the propriety of the Superior Court's June 13, 2006 sanctions order. With respect to the retroactive component of the sanctions order — which totaled $105,000 per contemnor at the time of the appeal — the Appellate Division noted that "conviction for criminal contempt requires proof of guilt beyond a reasonable doubt that a party willfully disobeyed a court's order." However, the Appellate Division

observed that "the evidence adduced at the March 1, 2006 hearing demonstrates a good faith effort to comply with the preliminary injunction and order," negating the conclusion that the Appellees willfully disobeyed the Superior Court's orders. Accordingly, the Appellate Division ruled that the Superior Court abused its discretion to the extent that it imposed retroactive fines on VIPA, East End Taxi, Caneel Bay, and Ritz Carlton.

The Appellate Division reached a similar conclusion with respect to the forward-looking, $1,000-per-day portion of the Superior Court's sanction. The Appellate Division reasoned that VITA had adduced insufficient evidence to demonstrate a single violation of the preliminary injunction, and consequently concluded that the Superior Court abused its discretion in imposing the second half of its sanction. The Appellate Division remanded the case to the Superior Court so that the case could continue.

After the Appellate Division remanded the case to the Superior Court, the Legislature enacted Act 7452 on November 30, 2012. Act 7452 contained similar terms to Act 5231, in that it granted VITA an exclusive franchise to service the St. Thomas airport, subject to exceptions similar to those contained in section 1(e) of Act 5231. But Act 7452 limited the term of VITA's franchise to five years, with an option to renew that franchise for a single, five-year term.

In accordance with the Appellate Division's remand, the parties conducted limited discovery on the question of whether VITA validly renewed the franchise agreement. Following briefing on the issue, the Superior Court concluded that VITA validly renewed the agreement by order entered August 2, 2013.

On August 11, 2014, the Superior Court entered an order that, among other things, directed all parties to inform the Superior Court of any pending motions or matters to be addressed, as well as the status of discovery by August 29, 2014. VITA did not comply with this order. On July 15, 2015, the Appellees jointly moved to dismiss VITA's complaint. VITA filed a response in opposition on August 17, 2015, in which it argued for the first time since the entry of the preliminary injunction in 1997 that it was entitled to a permanent injunction due to the Appellees' alleged violation of Act 5231.

The Superior Court granted the Appellees' motion in a June 10, 2016 memorandum opinion and order. The Superior Court presented two justifications for dismissing VITA's complaint, and rejected a third. First, the Superior Court separately dismissed the requests for relief contained

in VITA's complaint by ruling that VITA was not entitled to a permanent injunction because Act 5231 has expired; that the Appellate Division's reversal of the contempt sanctions constitutes the law of the case, and as such, could not be further litigated; that VITA cannot obtain damages on behalf of its drivers because it never attempted to file such a claim on their behalf; and that VITA cannot obtain any other damages because the doctrine of judicial estoppel precludes VITA from now asserting that damages are calculable where VITA once premised its litigation strategy on the theory that such damages were incalculable. The Superior Court also held that claims against Caneel Bay should be dismissed because CBI Acquisitions was not a party to this case and the Appellate Division had reversed the sanctions imposed against Caneel Bay. Second, the Superior Court concluded in the alternative that VITA's complaint should be dismissed in its entirety due to VITA's failure to prosecute. Finally, the Superior Court rejected the Appellees' contention that laches barred VITA's claims. VITA filed a timely notice of appeal on July 6, 2016.

## II. JURISDICTION

We have jurisdiction over all appeals arising from final judgments, final decrees, and final orders of the Superior Court. V.I. CODE ANN. tit. 4, § 32(a). An order that dismisses a plaintiff's complaint with prejudice is a final order within the meaning of section 32(a). *See Gumbs v. Koopmans*, 66 V.I. 429 (V.I. 2017); *Sarauw v. Fawkes*, 66 V.I. 253, 260 (V.I. 2017). Since the Superior Court's June 10, 2016 memorandum opinion and order dismissed VITA's complaint with prejudice, it constitutes a final order over which we have jurisdiction.

## III. DISCUSSION

We exercise plenary review over the Superior Court's application of the law and construction of a statute, and review its findings of fact for clear error. *Dupigny v. Tyson*, 66 V.I. 434, 439 (V.I. 2017) (citations omitted). We review the Superior Court's decision to grant or deny an injunction for an abuse of discretion, and the Superior Court abuses its discretion when its decision rests on an erroneous application of the law or an improper application of law to fact. *Moses v. Fawkes*, 66 V.I. 454, 459 (V.I. 2017) (citations omitted). Likewise, we review the Superior Court's conclusion that a matter should be dismissed for failure to prosecute for an abuse of discretion. *Halliday v. Footlocker Specialty, Inc.*, 53 V.I. 505, 510 (V.I. 2010).

■ The Superior Court dismantled VITA's claim by separately impugning VITA's request for injunctive relief, its request for sanctions, and its request for damages, and then by providing an alternate grounds for dismissing VITA's entire complaint. Correspondingly, VITA's appeal consists of four arguments. First, VITA contends that the Superior Court erred when it dismissed VITA's request for a permanent injunction as moot. Second, VITA challenges the Superior Court's rulings with respect to the Appellate Division's reversal of the Superior Court's sanctions orders. Third, VITA challenges the Superior Court's conclusion that it was unable to pursue claims for damages — both on its behalf and on behalf of its members. Finally, VITA argues that the Superior Court erred in concluding that failure to prosecute represented alternate grounds for dismissing its complaint.[10] We address each argument in turn.

## A. Dismissal of the Permanent Injunction Claim

The first component of VITA's claim is its request for a permanent injunction. VITA argues that the Superior Court erred when it concluded that the expiration of Act 5231 mooted VITA's permanent injunction claim. We reject this claim.

---

[10] As a fifth point, VITA "reserve[d] all rights to proceed against [Caneel Bay] on remand[,]" without specifically arguing that the Superior Court's decision to dismiss all claims against Caneel Bay was improper. *See V.I. Taxi Ass'n v. V.I. Port Auth.*, Case No. ST-97-CV-117, 2016 V.I. LEXIS 69, at *32 (V.I. Super. Ct. June 8, 2016) ("[T]he Court need not establish the law [of successor liability] in this matter since the Court has determined that all of the pre-2004 contempt sanctions against PBI have been vacated by the Appellate Division. Furthermore, the Court denied VITA's request to amend its Complaint to add CBI as a party to this litigation in 2012. As a result, the Court agrees with [Appellees] that any discovery requests related to the sale are irrelevant and all claims against [Caneel Bay] should be dismissed."). Nevertheless, VITA fully briefed why it believes the Superior Court erred in dismissing its claims for injunctive relief, contempt sanctions, and damages. Consequently, VITA has not waived its challenge to the dismissal of its claims against Caneel Bay. To the extent that any of these claims survive, as discussed below, VITA may be entitled to relief against Caneel Bay. But since VITA has not briefed the issue of successor liability and has not added CBI Acquisitions as a party, VITA has waived the opportunity to argue its entitlement to relief against CBI Acquisitions following its acquisition of the assets known as Caneel Bay Resort on St. Thomas on May 10, 2004. *See* V.I. R. APP. P. 22(m) ("Issues that were . . . not briefed . . . are deemed waived for purposes of appeal[.]"). Further, since VITA has neither assigned error to, nor briefed the Superior Court's denial of its motion to amend its complaint to add CBI Acquisitions as a party, we decline to review that decision on appeal. *See id.*

662

■ "The central question in a mootness problem is whether a change in the circumstances that prevailed at the beginning of litigation has forestalled the prospect for meaningful relief." *Zoning Bd. of Adjustment of Garfield Cnty. v. DeVilbiss*, 729 P.2d 353, 356 (Colo. 1986) (citations omitted); *see also id.* at 359-60 (concluding that the completion of a construction project mooted a request to permanently enjoin the construction of that project); *cf. Der Weer v. Hess Oil V.I. Corp.*, 60 V.I. 91, 98-99 (V.I. Super. Ct. 2014) ("A motion becomes moot when something occurs after a motion is filed that resolves the issues raised in that motion." (citations omitted)). A franchise is a contract between the grantor and the grantee, *see, e.g., Larson v. South Dakota*, 278 U.S. 429, 432, 49 S. Ct. 196, 73 L. Ed. 441 (1929) (observing that franchises to provide ferry service "were contracts between the state and the petitioner"),[11] and "[a]n 'exclusive franchise' is a contractual promise by the granting authority not to grant any similar franchises to anyone else." *Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1, Logan Cnty. v. City of Guthrie*, 2010 OK 51, 253 P.3d 38, 46 n.10 (Okla. 2010) (citation omitted). The expiration of a contract generally moots claims for injunctive relief with respect to that contract. *See, e.g., ACLU of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 53 (1st Cir. 2013) ("It is ordinarily true that a challenge to a contract becomes moot upon that contract's expiration. . . . This is also the rule in challenges to expired or exhausted government grants." (citations omitted)); *Commer v. Dist. Council 37*, No. 94 CIV. 8462 (DAB), 2003 U.S. Dist. LEXIS 12454,

---

[11] *See also B-C Cable Co. v. City and Borough of Juneau*, 613 P.2d 616, 619 (Alaska 1980) ("[A]lthough all three of the franchise agreements [granted to a cable television company] before us originated in the form of municipal ordinances, they are in fact contracts."); *Alpert v. Boise Water Corp.*, 118 Idaho 136, 795 P.2d 298, 306 (1990) (" '[A] franchise ordinance represents a contract between the city and its grantee.' " (quoting *City of Hayden v. Washington Water Power*, 108 Idaho 467, 700 P.2d 89, 90 (1985))); *Kansas City Power & Light Co. v. Town of Carrollton*, 346 Mo. 802, 142 S.W.2d 849, 854 (1940) ("Of course, a franchise, when acted upon, may become a contract."); *Appalachian Power Co. v. City of Huntington*, 158 W. Va. 240, 210 S.E.2d 471, 474 (1974) ("A franchise is a contract between a governing body and a private individual or corporation. As a contract, it is binding upon both parties and enforceable unless contrary to public policy."); *Tukwila v. Seattle*, 68 Wn.2d 611, 414 P.2d 597, 600 (1966) (en banc) ("Franchises [for the transmission, distribution, and sale of electrical energy], whether statutory or by ordinance, have the legal status of contracts, binding with equal force, according to the terms thereof, upon the granting authority and the granted entity." (quoting 5 Eugene McQuillin, Municipal Corporations § 19.39, at 1940 (3d ed. 1949))).

at *17 (S.D.N.Y. July 21, 2003) (finding a plaintiff's claim for injunctive relief to be moot where the challenged contract expired and the plaintiff did not amend his complaint to encompass any present or future contract), *aff'd*, 96 Fed. Appx. 777 (2d Cir. 2004).[12]

■ By virtue of the exclusive franchise granted by Act 5231, VITA was party to a contract with the Government of the Virgin Islands. *See Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869, 875 (9th Cir. 1987) (treating an exclusive franchise to provide taxi services from Hawaii's international airport as an exclusive contract between a taxi association and the Hawaii department of transportation). But that contract expired in 2007.[13] As a result, Appellees are no longer capable of interfering with the contractual relationship created by Act 5231, and any injunction prohibiting violations of Act 5231 would have no meaningful effect. *See City of Clinton v. S. Paramedic Svc's, Inc.*, 2012 Ark. 88, 387 S.W.3d 137, 142 (2012) (the repeal of ordinances that permitted a city to grant an exclusive franchise to an ambulance service mooted the question of whether a competitor of the recipient of that franchise was subject to those ordinances); *see also Columbian Rope Co. v. West*, 142 F.3d 1313, 1316-17, 330 U.S. App. D.C. 86 (D.C. Cir. 1998) (explaining that a challenge to award of a contract became moot when work under the contract was completed, and that neither injunctive

---

[12] *See also Wilson & Wilson v. City Council of Redwood City*, 191 Cal. App. 4th 1559, 120 Cal. Rptr. 3d 665, 679 (2011) ("California law has long recognized that the completion of a public works project moots challenges to the validity of the contracts under which the project was carried out."); *Winthal v. Fabrizi*, 26 Conn. App. 45, 596 A.2d 939, 940-41 (1991) (denying as moot an action for injunctive relief to restore a plaintiff's name to a civil service eligibility list where the suit was brought after the list in question expired); *Miller v. Kankakee & Pine Creek Drainage Ass'n*, 232 Ind. 412, 112 N.E.2d 852, 853 (1953) (explaining that, where the work to be performed under the contract had been completed, "there is nothing on which an order of injunction could operate," rendering a request for injunctive relief moot) (citing *South Park Floral Co. v. Garvey*, 182 Ind. 635, 107 N.E. 68 (1915)); *Felder v. Political Firm, L.L.C.*, 170 So. 3d 1022, 1027 (La. Ct. App. 2015) (the expiration of a noncompete agreement mooted a request to enjoin a violation of that agreement); *Shah v. Richland Mem'l Hosp.*, 350 S.C. 139, 564 S.E.2d 681, 688 (2002) (the expiration of a contract mooted a challenge to enjoin the operation of that contract).

[13] The Superior Court concluded that, by its terms, VITA's contract under Act 5231 expired in 2007. Appellees have not filed a cross appeal challenging the veracity of the Superior Court's August 2, 2013 memorandum opinion and order, in which the Superior Court held that VITA properly renewed its franchise for a second 10-year term. Nor do Appellees dispute on appeal that VITA's exclusive franchise under Act 5231 expired in 2007. Accordingly, we have no occasion to revisit the Superior Court's conclusions on that issue.

nor declaratory relief could meaningfully affect the parties). Consequently, the expiration of Act 5231 represents a change in the circumstances that prevailed at the beginning of this litigation, forestalling the Superior Court from granting VITA's request for further injunctive relief with respect to violations of Act 5231 and rendering VITA's request for a permanent injunction moot.[14]

▮▮▮ VITA nonetheless argues that the Superior Court "should have simply entered a permanent injunction" because, due to the operation of a holdover provision in Act 5231[15] and the enactment of Act 7452 in 2012, VITA claims that it has been continuously operating an exclusive franchise at the St. Thomas airport since the Legislature enacted Act 5231. But this request violates the principles that an injunction cannot be broader than necessary to restrain the unlawful conduct complained of, and that a court issuing an injunction "must ensure that [the injunction] is narrowly tailored 'to fit the particular circumstances of the case.' " *Caribbean Healthways, Inc. v. James*, 55 V.I. 691, 700 (V.I. 2011) (citations omitted). Franchises like the one at issue represent contractual relationships between the grantor and the recipient, *see Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1, Logan Cnty*, 253 P.3d at 46 n.10, and the fact that sequential franchise agreements govern the same subject matter does not, without more, automatically imply that a subsequent franchise agreement perpetuates the same contractual relationship that

---

[14] Although we have recognized exceptions to the mootness doctrine, *see V.I. Taxi Ass'n v. West Indian Co., Ltd.*, 66 V.I. 473 (V.I. 2017) (observing that an issue is not moot if the underlying legal issue is capable of repetition yet evading review (citing *Haynes v. Ottley*, 61 V.I. 547, 559 (V.I. 2014))), VITA has not argued that any such exceptions apply here. Accordingly, any such argument is waived. V.I. R. APP. P. 4(m) ("Issues that were . . . unsupported by argument and citation to legal authority[ ] are deemed waived for purposes of appeal.").

[15] Section 1(m) of Act 5231 contains the holdover provision cited by VITA, and provides in full that

> [i] n the event that [VITA] remains in possession of the premises after the expiration of this franchise as specified in subsection (f) of this section, it shall be deemed to be occupying the premises as a tenant month to month, subject to all applicable conditions, provisions and obligations of this franchise.

VITA contends that the exclusive franchise granted by section 1(a) of Act 5231 constitutes one of the "conditions, provisions[,] and obligations" of Act 5231, and as such, that it was still entitled to its exclusive franchise even after Act 5231 expired. But as discussed in note 16 below, this argument is irrelevant to our analysis of whether VITA's permanent injunction claim is moot.

existed under its predecessor. *See, e.g., Consumers Petroleum Co. v. Texaco, Inc.*, 804 F.2d 907, 911 (6th Cir. 1986) (treating an interim franchise entered into under the Petroleum Marketing Prices Act, 15 U.S.C. §§ 2801-2841, as separate and distinct from prior franchise agreements, and rejecting the argument that the interim franchise reflected one ongoing relationship between the parties). Additionally, Act 7452 contains no reference to Act 5231, let alone an indication that the Legislature intended for Act 7452 to perpetuate the same contractual relationship that existed between VITA and the Government under Act 5231. There was a five-year delay between the expiration of Act 5231 and the enactment of Act 7452, and although Act 7452 grants a similar exclusive franchise to VITA that it enjoyed under Act 5231, Act 7452 shortens the duration of that entitlement and obligates VIPA to negotiate a new rate that VITA must pay in order to retain its entitlement. *See* Act 7452 § 1(f). Accordingly, VITA's request to enjoin violations of Act 5231 must be viewed as a request to protect the contractual relationship created by that act, and nothing more. Since VITA only sued to enjoin Appellees from interfering with the relationship created under Act 5231 and did not amend its complaint to encompass alleged violations of Act 7452, any injunction intended to remedy alleged violations of the franchise guaranteed by Act 7452 necessarily exceeds the scope of relief sought by VITA, and would be broader than necessary to protect VITA from Appellees' alleged interference with the contractual relationship created under Act 5231.[16,17]

---

[16] VITA's contention that the holdover provision contained in section 1(m) of Act 5231 permitted its exclusive franchise to survive the life of Act 5231 is irrelevant to our consideration of the Superior Court's dismissal of VITA's permanent injunction claim because, even assuming that VITA's interpretation of that provision is correct, Act 7452 now governs the nature of VITA's exclusive franchise. When two statutes govern the same subject matter, the later-enacted statute generally takes priority over the older statute. *See V.I. Pub. Servs. Comm'n v. V.I. Water & Power Auth.*, 49 V.I. 478, 485 (V.I. 2008). So even if section 1(m)'s holdover provision extended the life of VITA's exclusive franchise, that effect would have terminated with the enactment of Act 7452 in 2012, along with VITA's ability to seek an injunction prohibiting violations of the contractual relationship created under Act 5231.

[17] VITA contends, for the first time in its reply brief, that, even assuming that its request for injunctive relief has become moot, the Superior Court should have granted it with leave to amend its complaint instead of dismissing its request for injunctive relief outright. Since VITA raises this argument for the first time in its reply brief, the argument is waived. *See Benjamin v. AIG Ins. Co. of Puerto Rico*, 56 V.I. 558, 567 (V.I. 2012) ("When an argument

## B. The Contempt Rulings

The second component of VITA's case is its alleged entitlement to compensatory sanctions for Appellees' failure to comply with the preliminary injunction. VITA assigns error to the Superior Court's invocation of the law-of-the-case doctrine, and to the Appellate Division's reversal of the Superior Court's contempt orders and related findings. Since we have authority to review each interlocutory order entered prior to a final judgment even if one of those orders was entered by the Appellate Division, *see* 4 V.I.C. § 32(c) (conferring authority); *Hodge v. Bluebeard's Castle, Inc.*, 62 V.I. 671, 686 (V.I. 2015) (exercising that authority and reviewing a remand from the Appellate Division), we consider VITA's challenge to the Superior Court's application of the law-of-the-case doctrine separately from its challenge to the Appellate Division's reversal of the Superior Court's contempt orders.[18,19]

### 1. Law-of-the-Case

The Superior Court concluded that, since the Appellate Division reversed the Superior Court's contempt orders, the law-of-the-case doctrine precluded VITA from further litigating claims for sanctions for the period from March 10, 1997 to June 13, 2006. Citing our decision in *Hodge v. Bluebeard's Castle, Inc.* as supporting authority, VITA now argues that "[t]he loss of appellate jurisdiction by the District Court since 2007 . . . makes it appropriate for the *Superior Court* to 'review a judgment of the District Court made under territorial law.' " VITA further argues that the Appellate Division's opinion "was necessarily limited to

---

is raised for the first time on appeal in a reply brief, that argument is deemed waived because the appellee will not get an opportunity to respond to the argument." (citations omitted)).

[18] As explained under section III(b)(2) below, VITA's failure to explicitly designate the Appellate Division's order reversing the Superior Court in its notice of appeal does not preclude our review of that order.

[19] The Superior Court also recognized that the Appellate Division reversed " 'all verbal findings made during [a] September 7, 2006 show cause hearing as based on insufficient evidence.' " *V.I. Taxi Ass'n*, 2016 V.I. LEXIS 69, at *30 (quoting *East End Taxi Servs., Inc. v. V.I. Taxi Ass'n*, 49 V.I. 658, 685 (D.V.I. App. Div. 2008)). VITA does not purport to appeal this portion of the Appellate Division's ruling, and neither party has briefed the propriety of that portion of the Appellate Division's order. Accordingly, we have no occasion to review that portion of the Appellate Division's order. *See* V.I. R. APP. P. 22(m) ("Issues that were . . . not . . . raised or objected to [and] not briefed . . . [and are] unsupported by argument and citation to legal authority[ ] are deemed waived for purposes of appeal[.]").

the criminal-contempt finding and the 'fine' the Superior Court imposed, as [the Appellate Division] did not — and could not have, consistent with its limited appellate jurisdiction — finally decide the civil-contempt aspect of the contempt findings." Appellees respond that VITA's characterization of the Superior Court's authority is unsupported by our holding in *Hodge*, and "is contrary to the most basic rules in American jurisprudence requiring a lower court to respect the holdings of an appellate tribunal on remand."

 In *Hodge*, we noted that we have yet to examine the extent to which the law-of-the-case doctrine applies in the Virgin Islands. *Hodge*, 62 V.I. at 688. The law-of-the-case doctrine is a doctrine of common law. *See Stoufflet v. United States*, 757 F.3d 1236, 1241 (11th Cir. 2014) (characterizing the law-of-the-case doctrine as a "common-law doctrine"); *Alaimalo v. United States*, 645 F.3d 1042, 1049 (9th Cir. 2011) (same); *United States v. Redd*, 630 F.3d 649, 651 (7th Cir. 2011) (same); *Greene v. Rothschild*, 68 Wn.2d 1, 414 P.2d 1013, 1014 (1966) (same). Consequently, in order to determine whether the Superior Court properly applied that doctrine, we must first apply the three-pronged test first set forth in *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967 (V.I. 2011), in order to determine whether, and if so the extent to which the law-of-the-case doctrine applies in this jurisdiction. This test requires us to first identify which common law rule Virgin Islands courts have applied in the past and then identify the rule adopted by a majority of other jurisdictions before identifying which common law rule represents the soundest rule of law for the Virgin Islands. *Machado v. Yacht Haven U.S.V.I., LLC*, 61 V.I. 373, 380 (V.I. 2014) (citing *Better Bldg. Maint. of the V.I., Inc. v. Lee*, 60 V.I. 740, 757 (V.I. 2014)).

 First, the law-of-the-case doctrine has been consistently employed in this jurisdiction for over two decades. *See Gov't Guarantee Fund v. Hyatt Corp.*, 166 F.R.D. 321, 34 V.I. 257, 268 n.17 (D.V.I. 1996) ("The doctrine of the law of the case dictates that 'when a court decides upon a rule of law, that rule should continue to govern the same issue in subsequent stages in the litigation.' " (citation and internal quotation marks omitted)). Courts in this jurisdiction have consistently recognized that, under the law-of-the-case doctrine, "a court is loath to revisit legal issues which it previously decided in the same case." *People v. Miller*, 53 V.I. 162, 168 (V.I. Super. Ct. 2010). As articulated in this jurisdiction, "[u]nder the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in

subsequent stages in the same case.' " *Hodge*, 62 V.I. at 688 (quoting *Pepper v. United States*, 562 U.S. 476, 506, 131 S. Ct. 1229, 179 L. Ed. 2d 196 (2011)); *accord Bellot v. Cardow, Inc.*, Case No. ST-2012-CV-297, 2014 V.I. LEXIS 64, at *4 (V.I. Super. Ct. Aug. 18, 2014) (describing the doctrine with the same language that we later used in *Hodge*). A litigant may also invoke the doctrine to preclude relitigation of issues in a later appeal that were decided in a previous appeal. *See General Offshore Corp. v. Farrelly*, 743 F. Supp. 1177, 25 V.I. 226, 261 n.19 (D.V.I. 1990).

 Second, a clear majority of jurisdictions in the United States employs the doctrine,[20] and does so without meaningful variations. The

---

[20] *See, e.g., Lary v. Flasch Bus. Consulting*, 909 So. 2d 194, 198 (Ala. Civ. App. 2005); *Beal v. Beal*, 209 P.3d 1012, 1016-17 (Alaska 2009); *Ctr. Bay Gardens, L.L.C. v. City of Tempe City Council*, 214 Ariz. 353, 153 P.3d 374, 377-78 (2007); *Zawodniak v. State*, 339 Ark. 66, 3 S.W.3d 292, 294 (1999); *People v. Barragan*, 32 Cal. 4th 236, 9 Cal. Rptr. 3d 76, 83 P.3d 480, 487-88 (2004); *People v. Roybal*, 672 P.2d 1003, 1005 (Colo. 1983); *Total Recycling Servs. of Ct., Inc. v. Connecticut Oil Recycling Servs., LLC*, 308 Conn. 312, 63 A.3d 896, 902 (2013); *State v. Wright*, 131 A.3d 310, 321 (Del. 2016); *Kritsidimas v. Sheskin*, 411 A.2d 370, 371-72 (D.C. 1980); *Florida Dep't of Transp. v. Juliano*, 801 So. 2d 101, 105-06 (Fla. 2001); *Hussey v. Say*, 139 Haw. 181, 384 P.3d 1282, 1286 (2016); *Taylor v. Maile*, 146 Idaho 705, 201 P.3d 1282, 1286 (2009); *Norris v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 368 Ill. App. 3d 576, 857 N.E.2d 859, 864, 306 Ill. Dec. 460 (2006); *Parker v. State*, 697 N.E.2d 1265, 1266 (Ind. Ct. App. 1998); *State v. Ragland*, 812 N.W.2d 654, 658 (Iowa 2012); *State v. Parry*, 305 Kan. 1189, 390 P.3d 879, 881 (2017); *Inman v. Inman*, 648 S.W.2d 847, 849 (Ky. 1982); *Pumphrey v. City of New Orleans*, 925 So. 2d 1202, 1207-08 (La. 2006); *United Air Lines, Inc. v. Hewins Travel Consultants, Inc.*, 622 A.2d 1163, 1167 (Me. 1993); *Scott v. State*, 379 Md. 170, 840 A.2d 715, 723 (2004); *Kitras v. Town of Aquinnah*, 474 Mass. 132, 49 N.E.3d 198, 210 (2016), *cert. denied*, 137 S. Ct. 506, 196 L. Ed. 2d 406 (2016); *Tomei v. Zarnick*, No. 223662, 2001 Mich. App. LEXIS 2492, at *3-4 (Mich. Ct. App. Oct. 23, 2001); *Willette v. Smith*, No. CX-99-1668, 2000 Minn. App. LEXIS 519, at *1-2 (Minn. Ct. App. May 30, 2000); *Lee v. Thompson*, 167 So. 3d 170, 176 (Miss. 2014); *In re Estate of Corbin*, 166 S.W.3d 102, 105-06 (Mo. Ct. App. 2005); *Jonas v. Jonas*, 2013 MT 202, 371 Mont. 113, 308 P.3d 33, 36 (2013); *Money v. Tyrrell Flowers*, 275 Neb. 602, 748 N.W.2d 49, 60 (2008); *Hsu v. Cty. of Clark*, 123 Nev. 625, 173 P.3d 724, 728-30 (2007); *Saunders v. Town of Kingston*, 160 N.H. 560, 8 A.3d 89, 95 (2010); *Lombardi v. Masso*, 207 N.J. 517, 25 A.3d 1080, 1092 (2011); *Alba v. Hayden*, 2010-NMCA-037, 148 N.M. 465, 237 P.3d 767, 769 (2010); *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 40 A.D.3d 1177, 834 N.Y.S.2d 736, 739 (2007); *Hayes v. City of Wilmington*, 243 N.C. 525, 91 S.E.2d 673, 681-82 (1956); *Gajewski v. Bratcher*, 307 N.W.2d 826, 831 (N.D. 1981); *State ex rel. Sharif v. McDonnell*, 91 Ohio St. 3d 46, 2001 Ohio 240, 741 N.E.2d 127, 129 (2001); *State ex rel. Pruitt v. Native Wholesale Supply*, 2014 OK 49, 338 P.3d 613, 620 (2014), *cert. denied*, 135 S. Ct. 1512, 191 L. Ed. 2d 433, *and reh'g denied*, 135 S. Ct. 1888, 191 L. Ed. 2d 756 (2015); *Poet v. Thompson*, 208 Ore. App. 442, 144 P.3d 1067, 1071-72 (2006); *Ario v. Reliance Ins. Co.*, 602 Pa. 490, 980 A.2d 588, 597 (2009); *Chavers v. Fleet Bank (RI), N.A.*, 844 A.2d 666, 677 (R.I. 2004); *Flexon v. PHC-Jasper, Inc.*, 413 S.C. 561, 776 S.E.2d 397, 403-04 (2015); *In re*

law-of-the-case doctrine is an "amorphous concept," which posits that, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Arizona v. California*, 460 U.S. 605, 618, 103 S. Ct. 1382, 75 L. Ed. 2d 318 (1984). "[G]enerally, the law[-]of[-]the[-]case doctrine is [a doctrine] of appellate procedure," *Scott v. State*, 379 Md. 170, 840 A.2d 715, 723 (2004), that "is grounded in the principle of stare decisis" and "prohibits the reconsideration of issues which have been adjudicated in a previous appeal in the same case." *Beal v. Beal*, 209 P.3d 1012, 1016-17 (Alaska 2009). This prohibition extends to subsequent proceedings in the trial court, as well as any later appeals taken to the same court that established the law of the case. *See Ctr. Bay Gardens, L.L.C. v. City of Tempe City Council*, 214 Ariz. 353, 153 P.3d 374, 377 (2007) ("[T]he decision of appellate court in a case is the law of that case on the points presented throughout all the subsequent proceedings in the case in both the trial and appellate courts."); *accord People v. Barragan*, 32 Cal. 4th 236, 9 Cal. Rptr. 3d 76, 83 P.3d 480, 487 (2004); *Parker v. State*, 697 N.E.2d 1265, 1266 (Ind. Ct. App. 1998); *State v. Ragland*, 812 N.W.2d 654, 658 (Iowa 2012); *Tomei v. Zarnick*, No. 223662, 2001 Mich. App. LEXIS 2492 (Mich. Ct. App. Oct. 23, 2001). It only applies to decisions on questions of law, *see Parker*, 697 N.E.2d at 1266; *Willette v. Smith*, No. CX-99-1668, 2000 Minn. App. LEXIS 519, at *2 (Minn. Ct. App. 2000) (unreported); *State v. Stuart*, 2003 WI 73, 262 Wis. 2d 620, 664 N.W.2d 82, 88 (2003), and to all conclusions that flow necessarily from such decisions. *See Barragan*, 83 P.3d at 488; *Saunders v. Town of Kingston*, 160 N.H. 560, 8 A.3d 89, 95 (2010); *Hayes v. City of Wilmington*, 243 N.C. 525, 91 S.E.2d 673, 682 (1956); *Flexon v. PHC-Jasper, Inc.*, 413 S.C. 561, 776 S.E.2d 397, 403 (2015); *State v. Jefferson*, 31 S.W.3d 558, 561 (Tenn. 2000), but "prevents consideration on a subsequent appeal of alleged errors that might have been, but were not, raised in the

---

*Pooled Advocate Trust*, 2012 SD 24, 813 N.W.2d 130, 139 (2012); *State v. Jefferson*, 31 S.W.3d 558, 560-61 (Tenn. 2000); *J.O. Lockridge Gen. Contractors, Inc. v. Morgan*, 848 S.W.2d 248, 250 (Tex. App. 1993); *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, 196 P.3d 588, 596 (2008); *Felis v. Felis*, 196 Vt. 643, 93 A.3d 1057, 2014 Vt. Unpub. LEXIS 69, at *5 (2014); *Uninsured Emp'rs Fund v. Thrush*, 255 Va. 14, 496 S.E.2d 57, 58-59 (1998); *Roberson v. Perez*, 156 Wn.2d 33, 123 P.3d 844, 848 (2005); *State ex rel. Frazier & Oxley, L.C. v. Cummings*, 214 W. Va. 802, 591 S.E.2d 728, 734 (2003); *State v. Stuart*, 2005 WI 47, 279 Wis. 2d 659, 695 N.W.2d 259, 261 n.2 (2005); *Lyden ex rel. Lyden v. Winer*, 913 P.2d 451, 454 (Wyo. 1996).

670

earlier appeal." *Taylor v. Maile*, 146 Idaho 705, 201 P.3d 1282, 1286 (2009); *accord Beal*, 209 P.3d at 1017; *In re Estate of Corbin*, 166 S.W.3d 102, 106 (Mo. Ct. App. 2005); *Flexon*, 776 S.E.2d at 403. "The doctrine applies with greater force when an appellate court remands a case to an inferior tribunal," and prohibits the lower tribunal from taking action inconsistent with the appellate court's ruling. *Money v. Tyrrell Flowers*, 275 Neb. 602, 748 N.W.2d 49, 60 (2008). But as amongst coordinate courts — whether at the trial or the appellate level — the doctrine merely guides the court's discretion without limiting the court's power. *Id.*; *accord Arizona*, 460 U.S. at 618; *In re Estate of Corbin*, 166 S.W.3d at 106; *Lombardi v. Masso*, 207 N.J. 517, 25 A.3d 1080, 1092 (2011); *Alba v. Hayden*, 2010-NMCA-037, 148 N.M. 465, 237 P.3d 767, 769 (2010); *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 40 A.D.3d 1177, 834 N.Y.S.2d 736, 739 (2007); *Flexon*, 776 S.E.2d at 403. Once established, the law of the case generally remains established "unless or until it is reversed or modified by a higher court." *Kritsidimas v. Sheskin*, 411 A.2d 370, 371 (D.C. 1980). But the law-of-the-case doctrine is never applied "to prevent a higher court from examining the correctness of the ruling of an intermediate appellate court." *Pumphrey v. City of New Orleans*, 925 So. 2d 1202, 1207 (La. 2006). And although the doctrine is subject to exceptions, *see, e.g., Hsu v. Cty. of Clark*, 123 Nev. 625, 173 P.3d 724, 728-29 (2007) (listing three exceptions recognized by federal courts, but observing that some states "have not clearly embraced all of these specific exceptions"); *see also State ex rel. Pruitt v. Native Wholesale Supply*, 2014 OK 49, 338 P.3d 613, 620 (2014) (observing only one exception to the doctrine), a litigant cannot invoke the law-of-the-case doctrine to preclude a trial judge from reconsidering his or her own ruling. *See Lombardi*, 25 A.3d at 1092 (observing that the doctrine "is entirely inapposite where . . . in trial court proceedings, the same judge is reconsidering his own interlocutory ruling"); *accord Island Tile & Marble, LLC v. Bertrand*, 57 V.I. 596, 613-14 (V.I. 2012) ("[T]he Superior Court possess[es] the authority . . . to modify or set aside [any] order prior to entry of a final judgment." (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983))).

██ ██ Third, the law-of-the-case doctrine precludes indefinite litigation, and promotes consistency, fairness, and judicial efficiency. *Beal*, 209 P.3d at 1017; *accord State v. Wright*, 131 A.3d 310, 321 (Del.

2016) (the doctrine promotes "efficiency, finality, stability and respect for the judicial system" (citation and internal quotation marks omitted)); *Norris v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 368 Ill. App. 3d 576, 857 N.E.2d 859, 864, 306 Ill. Dec. 460 (2006) (the doctrine's purpose "is to protect settled expectations of the parties, ensure uniformity of decisions, maintain consistency during the course of a single case, effectuate proper administration of justice, and bring litigation to an end." (citation and internal quotation marks omitted)).[21] The doctrine "serves the dual purpose of protecting against the reargument of settled issues and assuring the adherence of lower courts to the decisions of higher courts," *People v. Roybal*, 672 P.2d 1003, 1005 (Colo. 1983), and discourages judge shopping and multiple attempts to prevail on a single question. *Kritsidimas*, 411 A.2d at 371. With these considerations in mind — and in consideration of the fact that our prior articulation of the doctrine accords with the practices of the fifty states — we have no trouble concluding that the law-of-the-case doctrine represents the soundest rule of law for this jurisdiction.

Having reached this conclusion, we may now consider whether the Superior Court properly applied this doctrine when it determined that the Appellate Division's reversal of its contempt orders and related sanctions precluded VITA from further litigating claims for sanctions for the period from March 10, 1997 to June 13, 2006. We conclude that it did.

■■ ■ With respect to the $105,000 fixed portion of the Superior Court's contempt order that the Appellate Division characterized as a criminal contempt sanction, the Appellate Division concluded that VITA adduced insufficient evidence to permit the conclusion that Appellees willfully disobeyed the Superior Court. With respect to the ongoing $1,000 per diem portion of the Superior Court's contempt order that the Appellate Division characterized as a civil contempt sanction, the Appellate Division concluded that VITA failed to adduce any evidence that Appellees actually violated the Superior Court's orders. A ruling that evidence is sufficient to sustain a contempt sanction represents a ruling on

_____

[21] *See also Parker*, 697 N.E.2d at 1266 (the doctrine's purpose is "to minimize unnecessary relitigation of legal issues once they have been resolved by an appellate court"); *Ragland*, 812 N.W.2d at 658 (the doctrine "stems from a public policy against reopening matters which have already been decided" (citation and internal quotation marks omitted)); *United Air Lines, Inc.*, 622 A.2d at 1167 (the doctrine protects "the interest of finality and intra-court comity").

a question of law. *See, e.g., Brooks v. United States,* 686 A.2d 214, 219 (D.C. 1996) ("The question of whether . . . acts constitute the crime of contempt . . . is a question of law[.]"). By ruling that VITA did not provide sufficient evidence to sustain a finding of contempt, the Appellate Division ruled on a question of law. Under the law-of-the-case doctrine as adopted above, the Superior Court was bound to adhere to this ruling. Accordingly, the Superior Court did not err when it concluded that the law-of-the-case doctrine precluded VITA from relitigating sanctions for the period from March 10, 1997 to June 13, 2006.

## 2. Reversal of Contempt Findings and Related Sanctions

VITA next contends that we should reverse the Appellate Division's February 8, 2007 order reversing the Superior Court's contempt findings and related sanctions. Before addressing the merits of VITA's arguments and the Appellees' responses, we note that VITA did not designate the Appellate Division's February 7, 2008 order in its notice of appeal.

▮ A notice of appeal "shall designate the judgment, order, or part thereof appealed from and the reason(s) or issue(s) to be presented on appeal." V.I. R. APP. P. 4(c). When a notice of appeal fails to designate an order, that order is not properly before this Court for consideration. *See Dessout v. Brin,* 66 V.I. 308 & n.2 (V.I. 2017) (limiting consideration of issues on appeal to those orders designated by the appellant in his notice of appeal).

▮ However, VITA indicated in its notice of appeal that it was appealing "[a]ll rulings adverse" to it. Although we have never considered whether such catch-all language is sufficient to perfect appeals from otherwise-unspecified rulings, some jurisdictions have concluded that such language has that desired effect. *See, e.g., Luz v. Lopes,* 55 Cal. 2d 54, 10 Cal. Rptr. 161, 358 P.2d 289, 293 (1960) (concluding that an appeal from "all orders and rulings . . . which are adverse to [the appellants]" was sufficient to perfect an appeal from a default judgment that was not specifically identified in the notice of appeal); *Blink v. McNabb,* 287 N.W.2d 596, 598-99 (Iowa 1980) (finding a notice of appeal that identified the specific date of a final judgment, along with "all [o]rders, findings, [r]ulings and [o]pinions of the Court in the above entitled cause prior to, during, and subsequent to trial" to comply with the requirement that an appellant "shall specify . . . the decree, judgment, order or part thereof appealed from"); *Gates v. Goodyear,* 37 Kan. App. 2d 623,

155 P.3d 1196, 1199 (2007) ("Utilization of 'catch-all' language, such as 'and from each and every order or ruling entered against the appellant' or 'from all underlying adverse rulings' in a notice of appeal has been recognized as sufficiently inclusive to perfect appeals from otherwise unspecified rulings." (citation omitted)); *but see Piping Indus. Co. v. Future Fuel Chem. Co.*, 2013 Ark. App. 549, 3 (2013) (concluding that an appellant's failure to designate an amended jury verdict and judgment in its notice of appeal — despite purporting to appeal from "all other rulings adverse" to it — did not "designate the judgment or order appealed from" as required by the Arkansas Rules of Appellate Procedure). Moreover, Appellees claim no prejudice from VITA's failure to identify the Appellate Division's February 7, 2008 order specifically in its notice of appeal, and both parties have briefed the issue of whether that order should be affirmed or reversed. *See Blink*, 287 N.W.2d at 599 (observing that appellees' failure to assert prejudice with respect to a vague notice of appeal militated in favor of accepting the notice).

So while VITA's notice of appeal is certainly no model of clarity, VITA's failure to identify the Appellate Division's February 7, 2008 order with specificity does not preclude us from addressing, in this instance, VITA's claim that that order should be reversed. Accordingly, we may proceed to the merits of VITA's claims with respect to that order. VITA contends that we should reverse the Appellate Division's reversal of the Superior Court's contempt findings and related sanctions because the Appellate Division "committed reversible error when it substituted its view of the evidence for the detailed fact-findings of the trial court." Appellees argue that we should affirm the Appellate Division's reversal on its merits. They argue in the alternative that the contempt orders were invalid, as they violated both the plain text of Act 5231 and the Dormant Commerce Clause.[22] Appellees also argue in the alternative that we

---

[22] Because the Appellees did not raise their Dormant Commerce Clause argument in their July 15, 2015 motion to dismiss, that issue was not properly presented to the Superior Court, and is therefore waived under our rules. *See* V.I. R. App. P. 22(m) ("Issues that were . . . not raised or objected to before the Superior Court . . . are deemed waived for purposes of appeal[.]"). But even had the argument been properly presented to the Superior Court, we would still decline to address the Appellees' Dormant Commerce Clause argument, as we possess an obligation to avoid deciding constitutional issues needlessly. *Murrell v. People*, 54 V.I. 338, 347 (V.I. 2010) (quoting *Christopher v. Harbury*, 536 U.S. 403, 417, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002)). And as explained in subsections i and ii below, we affirm the

674

should affirm the Appellate Division's reversal because the contempt orders were not clear and unambiguous. VITA responds to Appellees' arguments by claiming that the Dormant Commerce Clause does not render Act 5231 unconstitutional, and expressly requests that we hold that the Dormant Commerce Clause does not apply to this jurisdiction. VITA also disputes Appellees' alternative argument that the contempt orders violated the plain text of Act 5231 and Appellees' characterization of those orders as unclear and ambiguous.

 In evaluating whether the Superior Court erred in holding Appellees in contempt, the Appellate Division was required to determine whether the Superior Court abused its discretion. *See In re Moorhead,* 63 V.I. 689, 692 (V.I. 2015) ("[T]he the Superior Court's decision to hold an individual in contempt is reviewed only for abuse of discretion." (citing *In re Najawicz,* 52 V.I. 311, 328 (V.I. 2008))). The Superior Court abuses its discretion when it makes a decision that " 'rests upon a clearly erroneous finding of fact, on an errant conclusion of law[,] or an improper application of law to fact.' " *Id.* (quoting *Petrus v. Queen Charlotte Hotel Corp.,* 56 V.I. 548, 554 (V.I. 2012)). The standards for establishing criminal and civil contempt differ. *See In re Moorhead,* 63 V.I. at 693 (explaining that "[a] party may be held in civil contempt for failure to comply with a court order if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner," but that a party may only be held in criminal contempt if it is established beyond a reasonable doubt that the contemnor willfully disobeyed a court order). Accordingly, we must first determine whether the Appellate Division appropriately characterized the nature of the contempt imposed by the Superior Court. *See Latrobe Steel Co. v. United Steelworkers of Am., AFL-CIO,* 545 F.2d 1336, 1342 (3d Cir. 1976) (in determining the nature of a contempt sanction, a reviewing court is not bound by the trial court's characterization, but must independently determine its nature (citations omitted)). Once we have done so, we may proceed to review the Appellate Division's abuse-of-discretion analysis.

---

Appellate Division's decision on its merits. So even if the Appellees had presented their Dormant Commerce Clause argument to the Superior Court, we would nevertheless decline to address the Appellees' constitutional arguments on appeal.

■ "A contempt sanction may be either civil or criminal in nature. A civil contempt sanction is 'intended to enforce the rights of private parties [and] to compel obedience to orders and decrees,' whereas the purpose of a criminal contempt sanction is 'the vindication of the dignity and authority of the court.' " *In re M.R.*, 64 V.I. 333, 343-44 (V.I. 2016) (quoting *Najawicz*, 52 V.I. at 326) (alterations in original); *accord Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994) ("[W]hether a sanction is civil or criminal turns on the 'character and purpose' of the sanction involved." (quoting *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441, 31 S. Ct. 492, 55 L. Ed. 797 (1911))). "[C]onclusions about the civil or criminal nature of a contempt sanction are properly drawn . . . 'from an examination of the character of the relief.' " *Id.* (quoting *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 636, 108 S. Ct. 1423, 99 L. Ed. 2d 721 (1988)). A contempt fine is considered criminal when it is "determinative and unconditional," "cannot undo or remedy what has been done," and cannot be avoided or mitigated through subsequent conduct. *Hicks*, 485 U.S. at 632-33 (citations and internal quotation marks omitted); *see also Latrobe Steel Co.*, 545 F.2d at 1343 ("[T]he penalties arising out of adjudications of criminal contempt are generally an absolute fine of a specific amount[.]"). By contrast, a contempt fine "is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.' " *Id.* at 829 (quoting *United States v. Mine Workers of Am.*, 330 U.S. 258, 303-04, 67 S. Ct. 677, 91 L. Ed. 884 (1947)). "Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." *Id.* (citing *Penfield Co. of Cal. v. SEC*, 330 U.S. 585, 590, 67 S. Ct. 918, 91 L. Ed. 1117 (1947)). Contempt may be both civil and criminal. *See Mine Workers of Am.*, 330 U.S. at 368 n.35 (explaining that, where contempt is both civil and criminal, "criminal procedure governs for purposes of review so that there may be immediate review of both the part that is civil and the part that is criminal") (citations omitted)).

Because the Superior Court issued its contempt order on June 13, 2006 but made it retroactive to March 1, 2006, the Appellees had already accrued a $105,000 fine for their alleged noncompliance with the preliminary injunction and August 3, 2005 order by the date that the Superior Court issued its contempt sanction. *East End Taxi Servs., Inc. v.*

*V.I. Taxi Ass'n, Inc.*, 49 V.I. 658, 675 (D.V.I. App. Div. 2008). The Appellate Division characterized this portion of the Superior Court's sanction as a criminal contempt sanction because it was fixed, unconditional, lacked a sufficient evidentiary basis, and was not made payable to VITA. *Id.* at 678. By contrast, the Appellate Division treated the $1,000 fine that accrued for each day following the issuance of the June 13, 2006 order as a civil contempt sanction because it was designed to coerce compliance with the Superior Court's orders. *Id.* at 678-79, 684.

■■■ We perceive no error in the Appellate Division's analysis. The $105,000 portion of the Superior Court's contempt fine bears the hallmarks of a criminal contempt sanction because it was fixed, punitive — because it was payable to the court and not VITA — and could not be avoided or mitigated by the Appellees. The Appellate Division also appropriately characterized the remaining $1,000 per day portion of the contempt fine as a civil contempt sanction because, although it was to be paid to the Superior Court and consequently not designed to compensate VITA, it was designed to coerce Appellees to comply with the preliminary injunction. *See In re Rogers*, 56 V.I. 325, 335 (V.I. 2012) ("If the court seeks to coerce someone to do something *or* to compensate a party, the contempt is typically considered civil in nature." (citing *Berne Corp. v. Gov't of the V.I.*, 570 F.3d 130, 139, 51 V.I. 1253 (3d Cir. 2009)) (emphasis added)).

Having concluded that the Appellate Division did not err in its characterization of the Superior Court's contempt sanction, we may now consider the propriety of the Appellate Division's conclusion that each portion of the contempt sanction was not supported by sufficient evidence. *See East End Taxi Servs., Inc.*, 49 V.I. at 685. The Superior Court's contempt sanction encompasses both civil and criminal elements, and does so for alleged violations of two court orders — the 1997 preliminary injunction, and the August 3, 2005 order. In order to ascertain the veracity of the Appellate Division's conclusion with respect to the sufficiency of the evidence, we must consider whether the evidence adduced was sufficient to support the imposition of sanctions against each Appellee, with respect to each order. Accordingly, we first consider whether there was sufficient evidence to support the imposition of criminal and civil sanctions with respect to alleged violations of the 1997 preliminary injunction, before turning to the Superior Court's August 3, 2005 order. In doing so, we affirm the Appellate Division's ruling.

677

### i. Evidence that Appellees Violated the 1997 Preliminary Injunction

■■■ Because of the criminal and civil elements of the Superior Court's sanction, we must consider whether sanctions were appropriate under the standards for both criminal and civil contempt. The Appellees may only be held in criminal contempt for violating the 1997 preliminary injunction if VITA proved, beyond a reasonable doubt, that the Appellees willfully violated that order. *See In re Moorhead*, 63 V.I. at 693 (a party may only be held in criminal contempt if it is established beyond a reasonable doubt that the contemnor willfully disobeyed a court order); *Premeaux v. Smith*, 569 So. 2d 681, 684 (Miss. 1990) ("The burden of proving the criminal contempt is on the party asserting it." (citation omitted)). In order to determine whether Appellees willfully violated that order, we must first examine the obligations imposed by that order.

In its 1997 preliminary injunction, the Superior Court enjoined VIPA "from permitting and facilitating others that [sic] [VITA] and those identified in Section 1, subsection (e) of Act No. 5231 from operating public taxicab service[s]" from the St. Thomas airport, and enjoined the remaining Appellees "from operating public taxicab service[s] from [the St. Thomas airport]" "except as provided in Act No. 5231, Section 1, subsection (e)." In its memorandum opinion supporting its order, the Superior Court did not address the requirements imposed by section 1(e) of Act 5231, except to say that "the hotels are permitted to have their own private or courtesy vehicles pick up their guests at the airport." In response to VITA's request, the Superior Court entered an amended preliminary injunction on May 27, 1997, which merely inserted the language of section 1(e) of Act 5231 instead of incorporating it by reference. Again, the Superior Court did not expound upon what was necessary to comply with the exceptions set forth in that section.

In its order affirming the preliminary injunction, the Appellate Division clarified what the Superior Court did not. Specifically, when affirming the Superior Court's conclusion that VITA was likely to succeed on the merits of its case, the Appellate Division observed that, under Act 5231, "[c]ompetitors outside of the Territory are prevented *only from providing non-prearranged taxicab service* at the airport." *V.I. Port Auth.*, 979 F. Supp. at 349 (emphasis added). The Appellate Division also observed that "Act No. 5231's 'tour operator' exception specifically provides that . . . a hotel guest may travel from the airport terminal to the hotel in a

non-VITA vehicle operated by a taxi operator or tour operated as *part of a prearranged package.*" *Id.* at 351 (emphasis added). Further, the Appellate Division held that, "to come within [the tour operator exception under section 1(e) of Act 5231], an appellant at a minimum has to comply with the Port Authority rules governing taxi and tour operators. Specifically, the appellants must provide valid vouchers or receipts to their guests who have *prearranged* ground transportation." *Id.* at 352 (emphasis added).

Despite its consistent references to "prearranged" transportation — and the absence of an interpretation that section 1(e) of Act 5231 required transportation to be both "prearranged" and "prepaid" — the Appellate Division nevertheless affirmed the Superior Court's finding that Appellees had failed to comply with the voucher requirement because they failed "to show that their guests' ground transportation had been prepaid *and* prearranged." *Id.* (emphasis added). To the extent that VITA — and the Superior Court in its July 13, 2006 sanctions order — read this language as a mandate by the Appellate Division that transportation be both prearranged and prepaid, they do so in error because such a requirement violates the plain text of Act 5231.

██ ██ " 'The first step when interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning. If the statutory language is unambiguous and the statutory scheme is coherent and consistent, no further inquiry is needed.' " *In re L.O.F.*, 62 V.I. 655, 661 (V.I. 2015) (quoting *In re Reynolds*, 60 V.I. 330, 334 (V.I. 2013)). The "tour operator" exemption of section 1(e) provides that VITA "is authorized to transport all persons from the terminal area [of the St. Thomas airport] except those departing by . . . a motor vehicle owned, operated or utilized by a tour agent in the transportation of passengers traveling on a prepaid **or** prepackaged tour, . . . provided that transportation from the terminal facility is part of the overall transportation arranged for in the prepaid **or** prepackaged tour." Act 5231, § 1(e), 1986 V.I. Sess. Laws 390, 391 (emphasis added). "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise[.]" *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979) (citation omitted). " 'It is proper to presume that a legislature knows the meaning of words, has used the words of a particular statute advisedly, and has expressed its intent by the[ ] words as found in th[e]

679

statute.' " *In re George*, 59 V.I. 913, 923 (V.I. 2013) (quoting *Gov't of the V.I. v. Thomas*, 9 V.I. 17, 23 (V.I. Super. Ct. 1971)) (alterations in original). Following this presumption, and in light of Act 5231's instruction that its provisions "shall be strictly construed," we find nothing in Act 5231 to suggest that the Legislature meant to conflate the terms "prearranged" and "prepaid." Consequently, one comes within the tour operator exception within section 1(e) by demonstrating that their transportation is either prearranged or prepaid.

Having clarified the requirements of Act 5231, we may now consider whether VITA adduced sufficient evidence during the June 24, 2005 hearing to demonstrate that the Appellees willfully violated the 1997 preliminary injunction. Unquestionably, VITA did not. VITA called three witnesses, Winston Parker, VITA's then-president, George Richardson, a member of VITA's board of directors, and Lisa Nunes, VITA's marketing director. Parker's testimony exclusively concerned the behavior of the Appellees following the June 24, 2005 hearing that formed the basis for the Superior Court's August 3, 2005 contempt order. To the extent that Parker's testimony alluded to conduct that predated the June 24, 2005 hearing, that testimony only illustrated that Appellees had been "giving out the same vouchers" they had been using before that hearing. Parker's testimony did not establish how Appellees' use of those vouchers violated the 1997 preliminary injunction. Rather, Parker's testimony showed that Appellees were using vouchers that may not have been "prepaid."[23] But nothing in his testimony indicates that the guests had not prearranged their transportation as part of their lodging on St. Thomas.

Richardson's testimony addressed the same subject matter as Parker's: the behavior of the Appellees following the June 24, 2005 hearing. As with Parker's testimony, Richardson's testimony only alluded to the fact that, prior to the June 24, 2005 hearing, Appellees had been using "what they used to use as vouchers," and that VIPA had been providing copies of those vouchers to VITA "on a daily basis." In fact, Richardson's testimony revealed that VITA had provided transportation on behalf of

---

[23] The testimony adduced during the hearing illustrates that the appellee hotels engaged in the practice of holding a room deposit with a guest's credit card. The parties dispute whether this fact was enough to constitute a prepayment for transportation, in order to bring the hotel in compliance with section 1(e) of Act 5231. But in light of the fact that transportation could be either prearranged or prepaid, we need not resolve whether the hotels' practices of holding room deposits was sufficient to bring them in compliance with section 1(e).

Caneel Bay from between the Superior Court's 1997 decision and the June 24, 2005 hearing. Also like Parker's testimony, Richardson's testimony suggests that the vouchers in question may not have been prepaid, but contains no indication that they were not part of prearranged lodging on St. Thomas.

As with the testimony of Parker and Richardson, Nunes's testimony pertained to the period of time following the June 24, 2005 hearing. Like Parker and Richardson, Nunes testified that guests' vouchers were not prepaid. But like Parker and Richardson, Nunes did not testify that the guests' vouchers did not evidence a prearranged contract for transportation that was part of the guests' lodging on St. Thomas.

 Even if the testimony adduced by VITA is true, it does not indicate that Appellees were not using prearranged travel vouchers.[24] Since VITA failed to introduce evidence that Appellees were using vouchers that were neither prepaid nor prearranged, it failed to demonstrate that any of the Appellees willfully violated the 1997 preliminary injunction.

 For this same reason, we cannot conclude that Appellees may be held in civil contempt for violating the 1997 preliminary injunction. A finding of civil contempt requires a showing by clear and convincing evidence that the contemnor disobeyed the court order in question. Because VITA did not demonstrate that the Appellees' vouchers did not constitute "transportation arranged for in [a] prepaid or prepackaged tour," Act 5231, § 1(e), 1986 V.I. Sess. Laws 390, 391, VITA did not demonstrate that the Appellees had violated the 1997 preliminary injunction. To the extent that the Superior Court premised its contempt sanctions on the Appellees' alleged violation of the preliminary injunction, the Superior Court erred.

### ii. Evidence that Appellees Violated the August 3, 2005 Order

As with our analysis of the 1997 preliminary injunction, we must first examine the requirements imposed by the Superior Court's August 3, 2005 order before we can determine whether VITA adduced sufficient evidence to permit the conclusion that the Appellees should be held in contempt for allegedly violating those requirements.

---

[24] To rebut the testimony adduced by VITA, Appellees introduced copies of the vouchers upon which they relied subsequent to the June 24, 2005 hearing. Each of these vouchers states that it constitutes evidence of a prepaid or prepackaged tour.

In its August 3, 2005 order, the Superior Court ordered that VIPA "shall not permit or facilitate any taxi operator who is not a driver for [VITA] to pick up any passenger(s) for hire from [the St. Thomas airport] unless said taxi operator and passenger can present a valid *pre-paid* voucher or receipt to [VITA] or the [Appellee] which demonstrates a contract between the passenger and a hotel operator, or a marine vessel, and a taxi operator and which *pre-paid* voucher or receipt contains the words 'Right' or 'Entitlement' thereon[.]" The Superior Court further instructed all Appellees to "cease and desist from operating in a manner contrary to the statutory requirements of Act 5231[,] . . . the Opinions and Judgments of this Court, and the Appellate Division of the District Court heretofore entered, and this present Order."

 In order for the Appellees to be held in contempt — either civil or criminal — VITA was required to demonstrate that each Appellee had not "diligently attempted to comply in a reasonable manner" with these dictates. *See In re Moorhead*, 63 V.I. at 693. Deviation from the exact terms of an order, without more, does not justify a finding of contempt. *See id.* Parker's own testimony demonstrates that, five days after the July 24, 2005 hearing upon which the August 3, 2005 contempt order was based, VITA met with VIPA, the Ritz Carlton, CBI Acquisitions, and East End Taxi, among others, and proposed the use of a new voucher. The language of this proposed voucher tracked not only language contained in section 1(e)'s tour operator exemption, but also the voucher requirements promulgated by VIPA that were in effect at that time.[25] And as the analysis of Act 5231 contained in the preceding section illustrates, vouchers may demonstrate compliance with section 1(e) if they show that a guest's transportation from the St. Thomas airport is part of a prepackaged tour. Evidence of prepayment, while also sufficient to demonstrate compliance, is not necessary. So although the voucher proposed by VIPA after the June 24, 2005 hearing contained the phrase

---

[25] Under the regulations in effect at the time, a valid voucher was

> any document, or combination of documents, clearly evidencing a prepaid or prearranged relationship between a passenger (or group of passengers) and a tour operator creating a right or entitlement of ground transportation to or from the airport or marine terminal as part of a prepaid or prepackaged tour which includes either land lodging or transportation on an ocean common carrier, provided that ground transportation to or from the airport or marine facility is part of the overall transportation arranged for in the prepaid or packaged tour.

"prepaid or prepackaged," we cannot say that VITA adduced sufficient evidence that the Appellees did not "diligently attempt[ ] to comply in a reasonable manner" with the Superior Court's August 3, 2005 order due to this deviation. Accordingly, to the extent that the Superior Court premised its contempt sanctions on Appellees' alleged violation of the August 3, 2005 order, the Superior Court erred.

## C. VITA's Claims for Damages

 The final component of VITA's case is its request for damages. VITA argues that the Superior Court erred in concluding that the doctrine of judicial estoppel prevented it from pursuing claims for damages allegedly suffered due to violations of the preliminary injunction, and further erred by concluding that VITA could not bring claims for damages on behalf of its individual drivers. Appellees urge us to conclude that the Superior Court did not abuse its discretion by invoking judicial estoppel to bar VITA from prosecuting a claim for damages. They also urge us to affirm the Superior Court's conclusion that, since VITA did not file claims for "lost fare" damages on behalf of its members, it could not now pursue such claims. Finally, as an alternate basis for affirming the Superior Court's conclusion with respect to VITA's attempt to press damages claims on behalf of its individual drivers, Appellees urge us to adopt the doctrine of associational standing and conclude that VITA lacks associational standing to pursue such claims.[26] In response to Appellees'

---

[26] Appellees also argued that VITA never accepted the franchise agreement by the deadline specified in section 1(aa) of Act 5231, and therefore, that the exclusive franchise upon which VITA relies never became operative. Although Appellees propounded this argument in their brief to demonstrate why one of the factors enumerated in *Halliday v. Footlocker Specialty, Inc.*, weighed in favor of dismissing VITA's complaint, Appellees claimed during oral argument that VITA's alleged failure to accept the franchise represented alternate grounds for affirming the Superior Court's June 10, 2016 order, including the Superior Court's dismissal of VITA's damages claims.

We have discretion to affirm the ruling of a lower court for reasons not addressed by that court if sufficient alternate grounds exist for doing so. *See, e.g., Hodge*, 62 V.I. at 696-99 (recognizing that we had authority to affirm an order from the Appellate Division on alternate grounds, but ultimately concluding that no such grounds existed). But generally, when the Superior Court predicates its ruling on one basis without addressing alternate arguments, we will decline to address those alternate arguments in the first instance on appeal. *See Rennie v. Hess Oil V.I. Corp.*, 62 V.I. 529, 541 (V.I. 2015) ("Ordinarily, when the Superior Court enters judgment on one basis, but fails to consider alternate arguments that were raised by the parties, this Court will decline to address those alternate issues in the first instance, and instead

arguments, VITA maintains that it is entitled to recover "lost fare"damages on behalf of its drivers because it pleaded such a claim in its complaint, because the doctrine of associational standing does not preclude the recovery of such damages, and because Act 5231 contains an implied private right of action that permits VITA to pursue seek such damages.

---

direct the Superior Court to do so on remand." (citations omitted)); *see also Fawkes v. Sarauw*, 66 V.I. 237 n.8 (V.I. 2017) (declining to consider whether the judicial estoppel doctrine presented an alternate justification for affirming the Superior Court's ruling). Furthermore, "[i]ssues that were ... not raised or objected to before the Superior Court ... are deemed waived for purposes of appeal[.]" V.I. R. APP. P. 22(m).

The Appellees did not premise their July 15, 2015 motion to dismiss VITA's complaint on VITA's allegedly ineffective acceptance of the franchise under section 1(aa) of Act 5231. To the contrary, the Appellees represented to the Superior Court that "VITA accepted the franchise and entered into a Taxi Concession Agreement" with VIPA, and that it was "undisputed that Act 5231 expired in June 30, 2007." Since the Appellees' argument that VITA's alleged ineffective acceptance under section 1(aa) of Act 5231 was not raised before the Superior Court in the Appellees' motion to dismiss, it is waived under our rules. V.I. R. APP. P. 22(m). Even if the Appellees had propounded such an argument in their motion to dismiss, the Superior Court's June 10, 2016 opinion did not rely on any related premise to justify the dismissal of VITA's complaint. Accordingly, it would be more appropriate for the Superior Court to address the validity of VITA's initial acceptance under Act 5231 in the first instance on remand. *See Rennie*, 62 V.I. at 541 (stating the general rule with respect to appellate consideration of alternate bases not considered by the trial court).

Some Appellees alluded to the alleged ineffective acceptance of the franchise in their briefing addressing the question of whether VITA validly renewed the franchise. In East End Taxi and Lettsome's response in opposition to VITA's motion for summary judgment on the issue of franchise renewal, for example, East End Taxi and Lettsome represented that, "on May 1, 1987, the rights and obligations of the exclusive franchise went into effect," and that VITA "accepted the franchise on April 10, 1987, pursuant to the terms of Act 5231(f) [sic]." Nevertheless, East End Taxi and Lettsome observed "[a]s a side note" that VITA "may also have failed to accept the original franchise itself within the deadline set under Act 5231." Caneel Bay "join[ed] and adopt[ed] by reference" East End Taxi and Lettsome's response in opposition. Most notably, in supplemental briefing ordered by the Appellate Division on the question of whether VITA validly renewed its franchise, East End Taxi argued specifically that VITA's renewal was not valid because VITA failed to accept the franchise in the first place. But although some of the Appellees suggested that VITA's acceptance of the franchise may have been ineffective, they did so for the purpose of arguing that VITA did not validly renew the franchise. The record does not reveal a single instance where any Appellee sought a ruling from the Superior Court that VITA's initial acceptance of the franchise contravened the requirements of Act 5231, and "this Court will 'not cull the record' to find material that [a party] had a duty to bring to the Court's attention." *Marsh-Monsanto v. Clarenbach*, 66 V.I. 366, 378 (citing *Madir v. Daniel*, 53 V.I. 623, 635 (V.I. 2010))). Consequently, the question of whether VITA validly entered into the initial franchise term under the parameters set forth in section 1(aa) of Act 5231 was not presented to the Superior Court, and is therefore waived. V.I. R. APP. P. 22(m).

684

VITA's claims entitlement to damages for itself, and on behalf of its drivers. We address each alleged entitlement in turn.

## 1. Damages allegedly suffered by VITA

■ The Superior Court relied on the doctrine of judicial estoppel to preclude VITA from pursuing claims for damages it suffered because of the Appellees' alleged violations of the injunction. Judicial estoppel "preclude[s] a party from asserting a position on a question of fact or a mixed question of law and fact that is inconsistent with a position taken by that party in a previous judicial proceeding if the totality of circumstances compels such a result." *Sarauw*, 66 V.I. at 265.With this framework in mind, we evaluate the Superior Court's conclusion that VITA was judicially estopped from pursuing damages because it obtained a preliminary injunction under the theory that it suffers irreparable injury due to "the impossibility of ascertaining with any accuracy the extent of [its] loss."

In the case of *Guidance Endodontics, LLC v. Dentsply Int'l Inc.*, No. CIV 08-1101 JB/RLP, 2010 U.S. Dist. LEXIS 98631 (D.N.M. Aug. 26, 2010), the defendants argued that a plaintiff that obtained a TRO and preliminary injunction based in part on the theory that monetary damages could not adequately remedy its injury should be judicially estopped from pursuing a claim for damages. 2010 U.S. Dist. LEXIS 98631, at *61. The United States District Court for the District of New Mexico rejected the defendants' argument, observing that preliminary injunctions preserve the status quo, while damages compensate for injuries actually sustained. *Id.* at *65. The "key fact" for the court in *Guidance Endodontics* was that the plaintiff's assertion of irreparable injury "included an aspect of financial loss" and that "compensatory damages . . . would not correct all of the harms [the plaintiff] expected to suffer," but that the plaintiff "was not asserting that it did not want, or would not seek" damages. *Id.* at *67.

■ Like the plaintiff in *Guidance Endodontics*, VITA had made no assertion that it does not want, or would not seek damages. In its complaint, VITA represented that is "has no *adequate* remedy at law" for VIPA's alleged refusal to enforce the exclusive franchise granted by Act 5231. But VITA has also pleaded that the Appellees' alleged conduct "has resulted in a loss of earnings and fares reviews [sic] to [VITA] and its members," and that it "is entitled to damages for all revenues and fares lost to unauthorized and illegal operators who openly violate the terms of

[VITA's] exclusive franchise." Further, VITA premised its claim for irreparable injury on the alleged erosion of its exclusive franchise due to the Appellees' conduct. *See Memphis St. Ry. Co. v. Rapid Transit Co.*, 133 Tenn. 99, 179 S.W. 635, 639 (1915) ("When a business may not be conducted as a matter of common right, but legislative authority is necessary, such authority, when conferred, is exclusive against all persons not endowed with like authority. Such rights, so bestowed by law, may not be infringed, except by authority of the state, and will be protected by injunction against unlawful invasion."). Nowhere in its motion for a TRO and preliminary injunction did VITA argue that monetary damages for the Appellees' alleged violations of Act 5231 were completely incalculable. *Cf. Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("[T]he simple fact that one could, if pressed, compute a money damages award does not always preclude a finding of irreparable harm."); *Cincinnati Sub-Zero Prods., Inc. v. Augustine Med., Inc.*, 800 F. Supp. 1549, 1560 (S.D. Ohio 1992) (concluding that movant had established existence of irreparable injury based in part on the theory that it lost a unique business opportunity, and observing that "the future ability to calculate compensatory damages does not automatically preclude [the movant] from showing irreparable harm"), *abrogated on other grounds by Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683 (6th Cir. 2000).

Rather, it was the Superior Court that characterized VITA's losses as "incalculable." In its order granting VITA's motion, the Superior Court observed that a plaintiff demonstrates irreparable injury by demonstrating " 'the impossibility of ascertaining with any accuracy the extent of the loss.' " The Superior Court concluded that VITA established irreparable injury by demonstrating that "it and its members daily suffer incalculable economic loss."

Despite this holding, VITA never abandoned its position that it was entitled to damages. In its February 8, 2006 motion for contempt sanctions, VITA argued that it was entitled to discovery in order to determine an appropriate compensatory sanction for Appellees' alleged failure to comply with the preliminary injunction, despite the fact that VITA represented that the Appellees' behavior "made it difficult, if nigh impossible, for VITA to calculate its compensatory damages." VITA further clarified its position in response to Appellees' June 15, 2015 motion to dismiss. In its opposition, it stated that it "could likely never

obtain complete proof of each time [Appellees allegedly] violated [Act 5231]," and that "it would be difficult, if not impossible, to fully calculate the profits it lost or the profits [Appellees] made as a result of each individual violation." Nevertheless, VITA maintained in its opposition that it was still entitled to discovery in order to substantiate damages with as much certainty as possible.

 Appellees characterize the argument in VITA's opposition as an "about face" with respect to its claim for damages, but the record does not support such a characterization. VITA has pleaded entitlement to damages from the day it filed its complaint. And although the Superior Court characterized VITA's damages as "incalculable" when it issued the preliminary injunction, the record demonstrates that VITA has consistently asserted an entitlement to damages resulting from Appellees' alleged violations of Act 5231. Accordingly, the Superior Court erred when it classified VITA's position on compensatory damages as "irreconcilably inconsistent" and deprived VITA of a chance to establish the damages it has suffered at trial. Whether that error mandates reversal, however, depends on whether we affirm the Superior Court's dismissal for failure to prosecute.[27]

---

[27] As discussed in footnotes 15 and 16 above, VITA argues that the exclusive franchise guaranteed by Act 5231 has been in continuous operation because section 1(m) of Act 5231 permitted VITA to occupy certain premises on a month-to-month basis after the expiration of that franchise "subject to all applicable conditions, provisions, and obligations of [the] franchise." If true, VITA's exclusive franchise would not have expired until the Legislature enacted Act 7452 in November of 2012, and VITA would be entitled to prove damages through that period of time. In interpreting a legislative act, we look first to its plain text. *Matter of Adoption of L.O.F.*, 62 V.I. at 661. If that language is unambiguous, our inquiry is at an end. *Id.* Moreover, the "[w]ords and phrases [of a legislative act] shall be read in their context and shall be construed according to the common and approved usage of the English language." 1 V.I.C. § 42.

Here, section 1(g) of Act 5231 obligates VIPA to provide VITA "with suitable office room and desk space for [its] traffic manager, space for the loading of passengers and line space at the respective terminal facility for such taxicabs as it may desire . . . ." Act 5231 § 1(m), 1986 V.I. Sess. Laws 390, 392. Section 1(m) of Act 5231 provides that, if VITA remains in possession of these premises after the expiration of the franchise, VITA "shall be deemed to be occupying the premises as a tenant month to month, subject to all applicable conditions, provisions and obligations of this franchise." Act 5231 § 1(m), 1986 V.I. Sess. Laws 390, 393.

A "provision" is understood to be "[a] clause in a statute, contract, or other legal instrument." BLACK'S LAW DICTIONARY 1345 (9th ed. 2009). So by its very inclusion in Act 5231, the exclusive franchise granted in section 1(a) of that act constitutes a "provision" of Act 5231. But the use of the adjective "applicable" to describe the "conditions, provisions

## 2. Damages allegedly suffered by VITA's drivers

■ The Superior Court concluded that VITA "did not seek to file any claim on behalf of [its] members[, and a]s a result, any claims for damages on behalf of the individual members . . . are dismissed." *V.I. Taxi Ass'n v. V.I. Port Auth.*, Case No. ST-97-CV-117, 2016 V.I. LEXIS 69, at *52 (V.I. Super. Ct. 2016). The Superior Court's reasoning ignores the clear language of VITA's complaint, in which VITA pleaded that VIPA's failure to enforce the exclusive franchise granted by Act 5231 "has resulted in loss of earnings and fares . . . to [VITA] and its members," and that it was entitled to recover "damages for all . . . fares lost to unauthorized and illegal operators who openly violate the terms of [VITA's] exclusive franchise." Consequently, the Superior Court erred when it dismissed VITA's claims for "lost fare" damages suffered by its drivers based on the premise that VITA never pursued such claims.

Nevertheless, "[n]o error or defect in any ruling or order . . . is ground for granting relief or reversal on appeal where its probable impact, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." V.I. R. APP. P. 4(i). Appellees argue that VITA does not have standing to bring claims for "lost fare" damages on behalf of its members under the doctrine of associational standing. VITA contends that the Appellees waived the ability to contest VITA's standing to recover "lost fare" damages, and that in any event, it would be permitted to pursue damages on behalf of its members under the doctrine of associational standing.

---

and obligations" that remain operative if VITA holds over as a tenant indicates that only those provisions that pertain to VITA's status as a tenant on VIPA's premises remain in effect. *See In re Ransom*, 380 B.R. 799, 807 (9th Cir. Bankr. 2007) (explaining how the use of the adjective "applicable" modifies the noun that follows it, limiting the scope of that noun); *In re Armstrong*, 370 B.R. 323, 330 (E.D. Wash. Bankr. 2007) (same). Such provisions include, for example, the general prohibition on alterations or additions to VITA's office space contained in section 1(h), or the requirement that VITA keep its office space "in constant and good condition and repair" as contained in section 1(i). By contrast, the exclusive franchise provision contained in section 1(a) of Act 5231 is not tied to VITA's status as a tenant, and therefore does not constitute an "applicable . . . provision[ ]" that pertains to VITA's status as a month-to-month tenant. Accordingly, we reject VITA's argument that the holdover provision contained in section 1(m) of Act 5231 extended its exclusive franchise past its expiration date in 2007 on a month-to-month basis. Consequently, to the extent that VITA is able to prove damages for alleged violations of Act 5231's exclusive franchise, such damages cannot extend past the expiration of Act 5231's exclusive franchise in 2007.

Associational standing, also known as "representational standing," "organizational standing," and "association standing," among other terms, *see Affiliated Constr. Trades Found. v. W. Va. Dept. of Transp.*, 227 W. Va. 653, 713 S.E.2d 809, 813 n.7 (2011), refers to the ability of an association to maintain a lawsuit as a representative of its members, even in the absence of direct injury to itself. *See, e.g., Robinson Twp., Washington Cnty. v. Com.*, 623 Pa. 564, 83 A.3d 901, 922-23 (2013) (environmental association had standing as an association to sue on behalf of its members allegedly aggrieved by a legislative enactment). The Supreme Court of the United States has explained that

> the doctrine of associational standing recognized that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others. "The only practical judicial policy when people pool their capital, their interests, or their activities under the name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all."

*Int'l Union, United Automobile, Aerospace, & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290, 106 S. Ct. 2523, 91 L. Ed. 2d 228 (1986) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 187, 71 S. Ct. 624, 95 L. Ed. 817 (1951)). Were we to accept Appellees' claim that VITA lacked associational standing to sue on behalf of its members, the Superior Court's failure to recognize that VITA pleaded a claim for "lost fare" damages incurred by its members would be harmless.

 Associational standing is a common-law principle, *see, e.g., Briarcliffe W. Townhouse Owners Ass'n v. Wiseman Constr. Co.*, 118 Ill. App. 3d 163, 454 N.E.2d 363, 367, 73 Ill. Dec. 503 (1983) (concluding that homeowners association had standing "under general common law principles" to "assert the rights of its individual members since it has alleged an immediate, direct and substantial injury to any one of them." (citing *1000 Grandview Ass'n v. Mt. Washington Assoc.*, 290 Pa. Super. 365, 434 A.2d 796, 797-98 (1981))), but it is not a principle that this Court has examined, let alone assimilated into Virgin Islands jurisprudence. Therefore, in order to determine whether the doctrine of associational standing permits VITA to maintain an action for damages on behalf of its members, we would first have to return to the tripartite *Banks* analysis and conclude that the doctrine represents the soundest rule of law for this jurisdiction. *See Machado*, 61 V.I. at 380 (citing *Better Bldg. Maint. of*

the V.I., Inc., 60 V.I. at 757). But we need not undertake such an analysis in the present litigation because "standing, like mootness, functions in the courts of the Virgin Islands as a claims processing rule that is subject to waiver should the party asserting the issue fail to raise it in a timely manner." *Benjamin v. AIG Ins. Co. of Puerto Rico*, 56 V.I. 558, 564-65 (V.I. 2012).

 Here, Appellees waived their ability to challenge VITA's standing because they delayed in raising such a challenge. In its complaint, VITA purported to state a claim for damages to recover "all revenues and fares lost" by itself "and its members." Despite this request for damages — which was pleaded in 1997 — Appellees did not challenge VITA's standing to assert such a claim until 2006 when they filed a response to VITA's estimate of costs and damages associated with Appellees' alleged violations of the preliminary injunction. Because of this delay, Appellees waived the ability to challenge VITA's standing to bring damages claims on behalf of its drivers. *See Benjamin*, 56 V.I. at 565 (failure to raise a potential standing issue for over two years resulted in the waiver of that issue).

 "[T]he entire doctrine of 'representational standing,' of which the notion of 'associational standing' is only one strand, rests on the premise that in certain circumstances, particular relationships (recognized either by common-law tradition or by statute) are sufficient to rebut the background presumption . . . that litigants may not assert the rights of absent third parties." *United Food & Commercial Workers Union Local 751*, 517 U.S. at 557; *see also id.* (recognizing that "representative damages litigation is common" (citation, internal quotation marks, and alterations omitted)). So while the traditional principles of compensatory damages generally permit a party to recover only to the extent of its injury and no further, *see London v. Bruskas*, 64 N.M. 73, 324 P.2d 424, 427 (1958) (stating the general principle that "[c]ompensatory damages can only be recovered by the party to whom [an] injury was done," and that "[t]here can be no award of damages to a third party for a wrong done to [a] plaintiff"), VITA's pursuit of "lost fare" damages on behalf of its members not only "affords a practical and sensible remedy to individual members who belong to [VITA] and, perhaps, lack the means to bring a lawsuit on [their] own behalf," but also avoids burdening the courts with an increased number of lawsuits arising out of identical facts. *See Int'l Ass'n of Firefighters, Local 1789 v. Spokane Airports*, 146 Wn.2d 207, 45 P.3d 186, 190 (2002) (discussing the prudential advantages to allowing an association to pursue monetary damages on behalf of its members).

690

██ Moreover, VITA's pursuit of "lost fare" damages on behalf of its members may produce the most equitable outcome for those members. In addition to the suit before us, VITA and several individual drivers sued the Appellees in the District Court, seeking damages, among other things. The District Court dismissed VITA's claims because VITA could not establish its suit was authorized or ratified, *V.I. Taxi Ass'n v. V.I .Port Auth.*, No. 08-142, 2015 U.S. Dist. LEXIS 124743, at *19 (D.V.I. Sept. 16, 2015), and dismissed the individual drivers' claims because the drivers either failed to prosecute their case, *see id.* at *21-23, or because there was no evidence that the drivers authorized the attorney to file the lawsuit. *See id.* at *25. The Third Circuit affirmed the District Court's dismissal by order dated March 27, 2017, *see Benjamin v. V.I. Port Auth.*, 684 Fed. Appx. 207 (3d Cir. 2017), and the plaintiffs did not seek certiorari to the Supreme Court of the United States. Consequently, to the extent that the drivers are able to recover "lost fare" damages, that relief will not come from the federal system. And while the Supreme Court has suggested that an association's deficient representation of its members does not necessarily preclude the members from maintaining a subsequent suit concerning the same subject matter, *see Brock*, 477 U.S. at 290, it is likely that the statute of limitations now precludes any of the individual drivers from maintaining suit for "lost fares" due to the Appellees' alleged interference with VITA's exclusive franchise under Act 5231, which expired in 2007. *See* 5 V.I.C. § 31(5) (providing a two-year statute of limitations for "any injury to the person or rights of another not arising on contract"). Consequently, permitting VITA to recover "lost fare" damages may be the only way in which any of VITA's affected drivers will see the fares they lost due to the Appellees' alleged interference with VITA's exclusive franchise. Phrased differently, the Appellees' waiver of associational standing may, in fact, produce the most equitable result for the drivers — assuming that VITA can prove that individual drivers actually lost fares — since the individual drivers do not appear to have any other means of recovering lost fares at this point.

Since Appellees cannot challenge VITA's standing to sue on behalf of its members, VITA is free to pursue those claims.[28] Consequently, the Superior Court's failure to recognize that VITA pleaded a damages claim

---

[28] Since this jurisdiction treats standing as a waivable claims processing rule, it is conceivable that a litigant may attempt to assert claims for damages against a defendant for injuries

on behalf of its members is not harmless error.[29] But as with the other aspect of VITA's claim for damages, whether this error mandates reversal depends on whether we affirm the Superior Court's dismissal for failure to prosecute.

## D. Failure to Prosecute

As alternate grounds for dismissing VITA's complaint, the Superior Court determined that VITA failed to prosecute its claims. VITA contends that the Superior Court erred when it concluded that failure to prosecute presented an alternate justification for dismissing its complaint, arguing that none of the factors set forth in *Halliday v. Footlocker Specialty, Inc.* favors dismissal. Appellees respond that dismissal for failure to prosecute represented sufficient alternate grounds for dismissing VITA's complaint.

 When determining whether to dismiss a case for failure to prosecute, the Superior Court must consider and weigh each of the six factors adopted in *Halliday*. Those factors are

> (1) the extent of the party's personal *responsibility;* (2) the *prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith;* (5) the effectiveness of sanctions other than dismissal, which entails an analysis of *alternative sanctions;* and (6) the *meritoriousness* of the claim or defense.

53 V.I. at 510 (quoting *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984)) (emphasis in original). We consider each factor in turn

suffered by a third party with whom the litigant has no relationship whatsoever, hoping that the unwary defendant will fail to raise standing in a timely manner. Since this is not such a case, and since the parties have provided absolutely no briefing on the issue whatsoever, we decline to editorialize on the interplay between standing's status as a waivable claims processing rule and the general proposition that compensatory damages may only be recovered by a party to whom injury was done. *See London,* 324 P.2d at 427.

[29] As an alternative grounds for establishing its right to sue on behalf of its members, VITA contends that Act 5231 contains an implied private right of action that permits such claims. Because VITA raised this argument for the first time in its reply brief, the argument is waived. *See Benjamin,* 56 V.I. at 567 ("When an argument is raised for the first time on appeal in a reply brief, that argument is deemed waived because the appellee will not get an opportunity to respond to the argument." (citations omitted)).

before determining whether the Superior Court abused its discretion in weighing the factors and concluding that dismissal was a permissible result.[30]

## 1. The Extent of VITA's Personal Responsibility for Delay

The Superior Court concluded that this factor weighed in favor of dismissal due to the fact that "VITA waited until 2006 to even attempt to file an amended complaint and to add the individual taxi drivers," but acknowledged that "the responsibility for failing to prosecute does not rest entirely with VITA." *V.I. Taxi Ass'n*, 2016 V.I. LEXIS 69, at *58. VITA contends that it is not responsible for any unreasonable delays, and that the Superior Court "uncritically accepted" Appellees' argument that VITA's failure to take action between 1997 and 2004 weighed in favor of dismissing its case. VITA contends that this gap of time cannot provide the basis for dismissal for failure to prosecute "when from 2004 to date VITA has been aggressively pursuing contempt enforcement, defending appeals, prevailing on dispositive motions, and actively seeking discovery." Appellees respond that VITA's delay between 1997 and 2004 reflects "a premeditated and intentional effort to parlay a mere preliminary injunction into a permanent injunction." VITA counters that, since 2004, Appellees "have refused to substantively answer discovery or otherwise participate in getting to the issue of damages[,] and VITA complied with all the appellate briefing schedules," but that the record shows that "VITA has been diligently prosecuting the damages-for-contempt phase of this case since it filed contempt motions in 2004."

 The first *Halliday* factor "focuses on the party's conduct [and examines] whether the party was responsible for the actions or inactions that led to dismissal of the case." *Watts v. Two Plus Two, Inc.*, 54 V.I. 286,

---

[30] We note that, after conducting its analysis, the Superior Court concluded that the *Halliday* factors "slightly favor[ed] dismissal." *V.I. Taxi Ass'n*, 2016 V.I. LEXIS 69, at *75. This itself constitutes error, as the Superior Court must conclude that, when weighed against one another, the six *Halliday* factors "strongly weigh in favor of dismissal as a sanction" for failure to prosecute. *Halliday*, 53 V.I. at 511. However, consistent with "our longstanding instruction 'that the preference is to decide cases on their merits,' " *Sarauw*, 66 V.I. at 265 (quoting *Fuller v. Browne*, 59 V.I. 948, 956 (V.I. 2013)), and in recognition of the extensive briefing provided by parties on the weight that should be accorded to the various *Halliday* factors, we elect to review the Superior Court's reasoning with respect to each factor, rather than rest our decision on its use of a single word.

300 (V.I. 2010). This inquiry distinguishes the acts of the party from the acts of its counsel. *See, e.g., Molloy v. Independence Blue Cross*, 56 V.I. 155, 190 (V.I. 2012) (plaintiffs' failure to appear at a hearing — despite their attorney's appearance — was considered and rejected as a justification for dismissing plaintiffs' complaint); *see also Poulis*, 747 F.2d at 868 (concluding that the plaintiffs lacked responsibility for their counsel's dilatory conduct).

Here, the record is undisputed that VITA took no action to prosecute this case from the time that the Appellate Division affirmed the Superior Court's preliminary injunction in September of 1997 until it moved for sanctions in May of 2004. Although VITA claims that the nearly seven-year delay was permissible because the Superior Court had not entered a scheduling order, other jurisdictions have dismissed actions for failure to prosecute based on shorter delays. *See, e.g., Westland v. Weinmeister*, 259 Mont. 412, 856 P.2d 1374, 1377-78 (1993) (five-year delay); *Valente v. First W. Sav. & Loan Ass'n*, 90 Nev. 377, 528 P.2d 699, 700 (1974) (four-and-a-half-year delay). It is equally undisputed that at no time during the life of Act 5231 did VITA move to convert its preliminary injunction to a permanent injunction. In fact, VITA only moved for the entry of a permanent injunction on August 17, 2015, three years after the Legislature enacted Act 7452, and even then, only in response to Appellees motion to dismiss for failure to prosecute.

 The only evidence in the record that VITA attempted to pursue its claims for damages is that, on April 21, 2006, VITA moved to amend its complaint and join its individual drivers as parties to the action. *V.I. Taxi Ass'n*, 2016 V.I. LEXIS 69, at *51. But when the Superior Court denied that request for failing to comply with the technicalities of Local Rule of Civil Procedure 15.1,[31] the record contains no evidence that VITA pursued amendment further. Rather, the record reveals that VITA attempted to pursue a similar claim for damages on behalf of its drivers in the District Court by complaint dated November 4, 2008. But while

---

[31] Local Rule of Civil Procedure 15.1 provides in full that

> A party who moves to amend a pleading shall file the amendment with the motion. Except as otherwise ordered by the Court, any amendment to a pleading, whether filed as a matter of course or upon a motion to amend, must reproduce the entire pleading as amended specifically delineating the changes or additions and may not incorporate any prior pleading by reference. A proffered amended pleading must note prominently on the first page the numbered amendment it represents; i.e., 1st, 2nd, 3rd, amendment, etc.

VITA has pointed to some evidence that it pursued its damages claims in the District Court, it has not pointed us to any evidence in the record — such as interrogatories, depositions, or expert reports — to indicate that it prosecuted its damages claims in the Superior Court. *See Marsh-Monsanto v. Clarenbach*, 66 V.I. 366, 378 (V.I. 2017) (indicating that this Court "will not cull the record to find material that the appellant had a duty to bring to the Court's attention" (quoting *Madir v. Daniel*, 53 V.I. 623, 635 (V.I. 2010)) (internal quotation marks omitted)). And although VITA submitted an estimate of damages to the Superior Court on September 2, 2005 for purposes of assisting the Superior Court in calculating the appropriate sanction to impose, the fact that VITA attempted to substantiate damages for the Appellees' alleged noncompliance with the preliminary injunction does not constitute evidence that VITA was pursuing the damages claims it pleaded in its original complaint. *See Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 584 (5th Cir. 2000) (recognizing that there is a difference between a damage action for harm resulting from illegal activity and a compensatory sanction issued by a court for disobedience of its mandates); *Chere Amie, Inc. v. Windstar Apparel Corp.*, 175 F. Supp. 2d 562, 567 (S.D.N.Y. 2001) (imposing both a fixed and per diem sanction for a defendant's failure to comply with a court order, but observing that the plaintiff was still entitled to compensatory damages to the extent that it could prove them at trial).

Finally, when ordered by the Superior Court to "submit [a] written brief[ ] concerning the status of this case, the remaining matters that require the Court's attention, and whether the case should be dismissed or a hearing conducted on the issue of damages," VITA failed to comply despite receiving an extension of time to do so.

 The record is unclear whether these delays are attributable to VITA's conduct, the conduct of VITA's attorneys over the years, or some combination of the two. Nevertheless, a plaintiff "cannot . . . avoid the consequences of the acts or omissions of [its] freely selected agent." *See Link v. Wabash R. Co.*, 370 U.S. 626, 634, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962) (finding no merit in the claim that a plaintiff suffered an unjust penalty after the court dismissed his petition as a result of his attorney's unexcused conduct). Given the breadth of the delays discussed above, it is reasonable to conclude that VITA shared some personal responsibility for the delay. *See Nat'l Hockey League v. Met. Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976) (concluding

695

that dismissal of plaintiff's complaint was appropriate due to the actions of both the client and its attorney). Accordingly, we find no error with respect to the Superior Court's conclusion that this *Halliday* factor weighed in favor of dismissal.

## 2. Prejudice Suffered by an Adverse Party due to the Offending Party's Failure to Comply with Scheduling Orders and Responses to Discovery

The Superior Court concluded that "there is no evidence in the record that [Appellees] have actually been prejudiced," but nonetheless concluded that this factor weighed slightly in favor of dismissal. *V.I. Taxi Ass'n*, 2016 V.I. LEXIS 69, at *64. VITA maintains that it "did not violate any scheduling deadline or discovery obligation," and that Appellees have otherwise failed to demonstrate that they have suffered prejudice. Appellees respond that VITA "failed to comply with the [Superior] Court's verbal [o]rder of October 6, 2016 by failing to file a brief detailing the remaining issues in the case by November 14, 2016."[32] Appellees further contend that VITA "failed to comply with the Superior Court's October 31, 2014 order by not filing such a brief. In its reply brief, VITA reasserts that, with the exception of the Superior Court's verbal order to file a brief by November 14, 2016, Appellees have not identified a single scheduling order that VITA has violated.

 "Some examples of prejudice include the irretrievable loss of evidence, an inevitable dimming of witnesses' memories, or excessive or [irremediable] burdens or costs imposed on an opposing party." *Watts*, 54 V.I. at 300 (citing *Briscoe v. Klaus*, 538 F.3d 252, 259 (3d Cir. 2008)). But this prejudice must arise as a function of the opposing party's "failure to file a timely or adequate pleading, discovery response, . . . pretrial statement," other paper, or to otherwise comply with a court order. *See Scarborough v. Eubanks*, 747 F.2d 871, 876 (3d Cir. 1984).

Appellees do not argue the existence of any such prejudice on appeal. While the passage of time since the institution of this case may have

---

[32] Based on Appellees' representations to the Superior Court in their motion to dismiss, it appears that Appellees' use of "2016" in their brief was a typographical error. In their motion to dismiss, Appellees alleged that the Superior Court orally ordered briefing on all outstanding issues at an October 6, 2014 hearing, such briefing to be submitted by November 14, 2014. (J.A. 475.)

resulted in lost evidence, dimmed memories, or excessive costs — as the Appellees argued below — Appellees do not allege that these harms flowed from VITA's failure to respond to the Superior Court's October 31, 2014 briefing order, or any other order issued by the Superior Court. So while the passage of time may have hampered both parties' ability to prepare for trial, we, like the Superior Court, cannot conclude that Appellees suffered harm due to VITA's failure to adhere to court orders and deadlines. But the Appellees' failure to connect any alleged prejudice to VITA's failure to comply with the Superior Court's orders precludes us from affirming the Superior Court's conclusion that this factor weighs in favor of dismissal.

### 3. History of Dilatoriness

The Superior Court observed that it was "unable to find a clear history of dilatoriness by [VITA] in this case," and concluded that this factor weighed against dismissal. *V.I. Taxi Ass'n*, 2016 V.I. LEXIS 69, at *69. VITA agrees with the Superior Court's conclusion, but Appellees disagree. They argue that "VITA took no action in this matter between the resolution of the appeal [of the March 10, 1997 preliminary injunction] on September 22, 1997, and its 'post-judgment' motion on May 12, 2004." They further argue that VITA delayed this matter for 3 years when it appealed the Appellate Division's 2008 ruling with respect to the contempt sanction, and for an additional 7 months by failing to file a brief on the outstanding issues in this case on or before November 14, 2014. Appellees submit that this conduct "demonstrates a staggering history of dilatory behavior on VITA's part." VITA replies that, prior to 2004, no scheduling order compelled it to advance its case, and it was entitled to allow the preliminary injunction to protect its interests.

 "A history of dilatoriness is characterized by conduct involving a consistent delay by the plaintiff's counsel." *Watts*, 54 V.I. at 306 (citing *Poulis*, 747 F.2d at 868). A delay in prosecuting a case for more than four years constitutes sufficient evidence that the plaintiff has a history of dilatoriness. *See Adams*, 29 F.3d at 875 (observing that "[f]our and one-half years is a significant and inexcusable delay," and it is "quite sufficient if [the plaintiff] does nothing, knowing that until something is done there will be no trial" (quoting *Bendix Aviation Corp. v. Glass*, 32 F.R.D. 375, 377 (E.D. Pa. 1962), *aff'd* 314 F.2d 944 (3d Cir. 1963) (per curiam), *cert. denied*, 375 U.S. 817, 84 S. Ct. 51, 11 L. Ed. 2d 52 (1963)).

Here, it is undisputed that VITA did nothing to advance the merits of its case for close to seven years, despite knowing that the Superior Court had not fixed a scheduling order governing the remainder of the case. If a history of dilatoriness can be found from a four-year delay, a delay of nearly seven years is more than sufficient to support a finding that VITA had a history of dilatoriness. And to the extent that the delays discussed under subsection 1 above are not attributable to VITA as a party, they are attributed to VITA's counsel. Accordingly, the Superior Court erred in concluding that this factor weighed against dismissal.

## 4. Evidence of Willfulness or Bad Faith

The Superior Court observed that, "although a specific instance of bad faith [was] not present in the record, VITA held the burden to pursue resolution on the merits and the delay was unreasonable, especially in light of the fact that the preliminary injunction has extended beyond the life of Act No. 5231." *V.I. Taxi Ass'n*, 2016 V.I. LEXIS 69. It concluded that this factor weighed slightly in favor of dismissal. *Id.* at *71. VITA agrees with the Superior Court's observation that the record reveals no specific instance of bad faith, and faults Appellees for "trying to parlay their failure to move for relief from the injunction . . . into a claim that VITA should somehow be punished for being initially satisfied with the injunctive relief they obtained . . . and . . . successfully defended on appeal." Appellees argue that there was simply no excuse for VITA's failure to prosecute the matter for the seven years following the affirmance of the preliminary injunction to the filing of VITA's first contempt motion. Appellees characterize this delay as a "self-dealing, merit-avoiding tactic" that embodies a "bad faith strategy." In its reply brief, VITA again contends that its silence from 1997 to 2004 is only indicative of their contentment with the preliminary injunction, and fails to demonstrate bad faith.

██ " 'In the jurisprudence of dismissal, willfulness or bad faith is . . . required in order for dismissal to be within the proper scope of the court's discretion [in most cases].' " *Watts*, 54 V.I. at 308 (quoting *Estate of Spear v. C.I.R.*, 41 F.3d 103, 112 (3d Cir. 1994)) (alterations in original). "Willful" conduct that justifies dismissal is conduct "that is deliberate and contumacious," and that "involves intentional or self-serving behavior." *Id.* (citations omitted). Willful conduct, without a finding of bad faith, may still support a conclusion that dismissal for failure to prosecute is

698

warranted, *see, e.g., Emerson v. Thiel College,* 296 F.3d 184, 191 (3d Cir. 2002) (affirming dismissal for failure to prosecute based in part on the conclusion that the plaintiff's delay was willful, if not in bad faith), but the absence of a good-faith effort to prosecute a case does not. *See, e.g., Adams,* 29 F.3d at 876 (observing that a "failure to move with dispatch" did not amount to willfulness or bad faith that justifies dismissal for failure to prosecute).

Here, as discussed above, much of the delay in this case is attributable to VITA's inaction. Yet as also explained above, this delay cannot be attributed to a disregard for the Superior Court's orders. While VITA certainly "failed to move with dispatch" in prosecuting its action, we perceive no "contumacious" behavior that would justify a finding that VITA's delay was willful or the product of bad faith. Consequently, we disagree with the Superior Court's conclusion that this factor weighed in favor of dismissing VITA's complaint.

## 5. Effectiveness of Sanctions as an Alternative Means of Dismissing the Case

The Superior Court observed that VITA "delayed prosecuting this case to resolution on the merits on numerous occasions and that the damages VITA is seeking could have been timely prosecuted years ago." *V.I. Taxi Ass'n,* 2016 V.I. LEXIS 69, at *75. VITA claims that it did not engage in any sanctionable conduct, let alone conduct that warrants the dismissal of its case. Appellees contend that, due to VITA's alleged delays, the only effective sanction is dismissal.

██ "[A]s a general rule, dismissing a case for failure to prosecute is a sanction a court should impose as a last resort." *Watts,* 54 V.I. at 310. The Superior Court abuses its discretion when it fails to consider the propriety of other sanctions short of dismissal. *See Molloy,* 56 V.I. at 188 (reversing dismissal for failure to prosecute because, among other things, the Superior Court did not consider whether sanctions other than dismissal could be imposed against the plaintiffs).

Here, the Superior Court observed that alternative sanctions may include " 'excluding evidence, precluding witnesses from testifying, striking portions of pleadings, or imposing monetary sanctions to compensate the harmed party for reasonable expenses.' " *V.I. Taxi Ass'n,* 2016 V.I. LEXIS 69, at *73 (quoting *Andrews v. Gov't of the V.I.,*

132 F.R.D. 405, 413, 25 V.I. 284 (D.V.I. 1990)). But nowhere in its opinion did the Superior Court weigh the appropriateness of these other remedies, let alone explain why dismissal was the most appropriate remedy. 2016 V.I. LEXIS 69, at *74-75. Consequently, this factor weighs against dismissal of VITA's complaint.

## 6. Meritoriousness of the Claim or Defense

The Superior Court found that VITA does not have meritorious claims because its request for a permanent injunction is moot and it is judicially estopped from pursuing its claims for damages. *V.I. Taxi Ass'n*, 2016 V.I. LEXIS 69, at *73. VITA disagrees. It argues that the proper consideration is whether the allegations contained in its pleadings, if proven at trial, would support recovery, and that it obtained several merits-related victories over the course of the litigation. Appellees argue that VITA's entire claim lacks merit.[33]

█ " 'A claim, or defense, will be deemed meritorious where the allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete defense,' " *Molloy*, 56 V.I. at 188 (quoting *Poulis*, 747 F.2d at 869-70), and the Superior Court must consider whether it was "likely, or even possible that [VITA] could prevail at trial on [its] allegations." *Id.* The Superior Court engaged in this analysis when it noted that VITA was entitled to neither a permanent injunction nor damages. *V.I. Taxi Ass'n*, 2016 V.I. LEXIS 69, at *73. As discussed above, the Superior Court's conclusion with respect to VITA's request for a permanent injunction was correct. But its conclusion with respect to VITA's damages claims was not. Since VITA was still entitled to substantiate its request for compensatory damages at trial — both on its behalf and on behalf of its members — a portion of its claim was meritorious. Consequently, the Superior Court erred when it determined that this factor weighed in favor of dismissing VITA's complaint.

## 7. Balancing the *Halliday* Factors

█ After making findings on all six *Halliday* factors, the Superior Court concluded that "dismissal is slightly justified . . . for failure to

---

[33] The Appellees premise this argument on the proposition discussed in footnote 26, above, that VITA never validly accepted the franchise agreement in the first place. As explained in that footnote, this argument is waived on appeal because it was not presented to the Superior Court. V.I. R. APP. P. 22(m).

prosecute." *V.I. Taxi Ass'n*, 2016 V.I. LEXIS 69, at *75. Although much of the delay in this case is attributable to VITA's inaction for lengthy periods of time, the Superior Court abused its discretion in reaching its conclusion because it failed to recognize that a portion of VITA's damages claims was meritorious, because it failed to consider the appropriateness of sanctions short of dismissal, and because VITA's conduct, while certainly dilatory, did not amount to the "willful or bad faith" conduct necessary to justify dismissal for failure to prosecute. Because the Superior Court abused its discretion in concluding that dismissal for failure to prosecute represented an alternative justification for dismissing VITA's complaint, we reverse all related parts of the Superior Court's June 10, 2016 memorandum opinion and order.

## IV. CONCLUSION

The Superior Court did not err in dismissing VITA's permanent injunction claim as moot because Act 5231 had expired and any injunction prohibiting the interference with the contractual relationship created by that act would be meaningless. Similarly, the Superior Court did not err in applying the law-of-the-case doctrine to the Appellate Division's reversal of its contempt sanctions, and the Appellate Division correctly reversed those sanctions due to insufficient evidence. But the Superior Court erred when it determined that VITA was estopped from pursuing compensatory damages both for itself and on behalf of its members, because VITA's request for preliminary injunctive relief is not inconsistent with its request for compensatory damages, and because the Appellees failed to timely challenge VITA's standing to seek such damages on behalf of its members. Finally, the Superior Court erred in concluding that the six *Halliday* factors constituted an alternative basis for dismissing VITA's complaint. So although VITA's request for injunctive relief is moot, VITA's claims for damages still survive, and VITA is entitled to substantiate whatever damages it can at trial. Accordingly, we affirm the Superior Court's June 10, 2016 memorandum opinion and order in part, reverse in part, and remand this matter for further proceedings consistent with this opinion.